Robert Wayne SAWYER,
Petitioner–Appellant,

v.

John WHITLEY, Warden, Louisiana
State Penitentiary, Respondent–
Appellee.

No. 91–3658.

United States Court of Appeals,
Fifth Circuit.

Oct. 10, 1991.

As Amended Nov. 12, 1991.

Certiorari Granted Nov. 14, 1991.
See 112 S.Ct. 434.

**814**

Sarah L. Ottinger, Nicholas T. Trenticosta, R. Neal Walker, New Orleans, La., for Robert W. Sawyer.

Dorothy Ann Pendergast, Terry M. Boudreaux, Asst. Dist. Atty., Gretna, La., Annette Marie Viator, La. Dept. of Corr., Baton Rouge, La., for John P. Whitley.

Dana E. Parker, William C. Zapalac, Asst. Attys. Gen., Austin, Tex., for amicus State of Tex.

Before KING, DAVIS and SMITH, Circuit Judges.

KING, Circuit Judge:

After granting Robert Sawyer a certificate of probable cause and a stay of execution, we review the merits of his second federal habeas petition. Sawyer presents one successive claim and two abusive claims in this second petition.[1] He repeats the claim that his counsel was ineffective in failing to present at the sentencing phase of his capital murder trial evidence of his mental impairment. We dismiss this successive claim because Sawyer fails to show that he is "actually innocent" of the death penalty. Sawyer contends for the first time in his second petition (1) that he was incompetent to stand trial and (2) that the State withheld vital exculpatory evidence against him. We also dismiss these abusive claims because we find that Sawyer neither establishes cause and prejudice nor shows that he is actually innocent of his conviction or sentence. We affirm the district court's judgment dismissing Sawyer's request for habeas corpus relief and vacate his stay of execution.

## I. BACKGROUND

A Louisiana state jury condemned Robert Sawyer to death in 1980 for the murder of Frances Arwood,[2] who was staying with Sawyer and Cynthia Shano, Sawyer's fiancee, and was helping to care for Shano's children. After a night of drinking, Sawyer and Shano returned to their home with an acquaintance, Charles Lane. Sawyer argued with Arwood and accused her of giving pills to one of Shano's children. The argument escalated to violence. Sawyer and Lane beat Arwood, scalded her with boiling water, and finally burned her scalded and unconscious body with lighter fluid.[3] She died several weeks later as a result of this vicious attack.

A state trial court convicted Sawyer of capital murder, and the Louisiana Supreme Court affirmed Sawyer's conviction and sentence on direct appeal. *See State v. Sawyer*, 422 So.2d 95 (La.1982). The United States Supreme Court vacated and remanded to the Louisiana Supreme Court for consideration of the sentence under *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). *See Sawyer v. Louisiana*, 463 U.S. 1223, 103 S.Ct. 3567, 77 L.Ed.2d 1407 (1983). On remand, the Louisiana Supreme Court again affirmed the conviction and sentence. *See State v. Sawyer*, 442 So.2d 1136 (La.1983). Sawyer filed a petition for state post-conviction review, and after an evidentiary hearing, the state trial court denied relief. Sawyer then sought a writ of habeas corpus in the Louisiana Supreme Court, which denied his ap-

---

1. Sawyer presented three additional claims challenging the constitutionality of death by electrocution in Louisiana's electric chair in his application for a certificate of probable cause. On July 2, 1991, however, the Louisiana legislature amended its statute to require that every sentence of death executed on or after September 15, 1991, be by lethal injection. This change of law rendered these three claims moot.

2. The details of Sawyer's horrifying crime have been recounted a number of times. *See, e.g., Sawyer v. State*, 442 So.2d 1136, 1136–37 (La. 1983).

3. Lane also was convicted of first degree murder in a separate trial, but he received a sentence of life. *See State v. Lane*, 414 So.2d 1223 (La.1982).

plication without written opinion. *See Sawyer v. Maggio*, 479 So.2d 360 (La.1985).

In 1986, Sawyer filed his first petition for federal habeas corpus relief, raising eighteen claims, including ineffective assistance of counsel, all of which the court addressed on the merits and denied. A panel of this court affirmed that denial on appeal. *See Sawyer v. Butler*, 848 F.2d 582 (5th Cir. 1988).[4] We then granted rehearing *en banc* and upheld the panel's opinion. *See Sawyer v. Butler*, 881 F.2d 1273 (5th Cir. 1989) (*en banc*), *cert. granted*, 493 U.S. 1042, 110 S.Ct. 835, 107 L.Ed.2d 830 (1990). The United States Supreme Court affirmed.[5] *See Sawyer v. Smith*, — U.S. —, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990).

Sawyer next filed a second state post-conviction petition. On October 5, 1990, the state trial court summarily denied Sawyer's application as repetitive and without merit. The Louisiana Supreme Court denied Sawyer's supervisory writ without opinion on October 7, 1990.

On October 8, 1990, Sawyer filed his second petition for federal habeas corpus relief. The district court granted a stay of execution, and, following an evidentiary hearing, rejected one of Sawyer's claims on the merits and the remaining claims as barred under Rule 9(b) of the Rules Governing Section 2254 Cases, 772 F.Supp. 297. The district court also vacated its stay of execution and denied a certificate of probable cause to appeal. Sawyer applied to this court for a certificate of probable cause.

We granted the certificate on the ground that his case presented a question which is debatable among jurists of reason and has not yet been fully addressed in this circuit: what it means to be "actually innocent" of the death penalty in determining whether to entertain a successive claim or an abusive claim that fails to meet the cause and prejudice requirement.

## II. ANALYSIS

### A. Standard of Review

■ Because this is Sawyer's second federal habeas petition, we first must determine whether we can reach the merits of his claims. *See* 28 U.S.C. § 2244(b) (1988); Rule 9(b) of Rules Governing Section 2254 Cases (constraining the ability of federal courts to entertain the merits of subsequent or successive claims). When a condemned prisoner presents successive petitions for a writ of habeas corpus, the state has a legitimate interest in preventing the prisoner from abusing the writ and using successive petitions as a mere delaying tactic. If the petitioner raises a claim that a federal court has already considered in a previous habeas corpus petition, we may review the merits of the successive claim only when "the prisoner supplements his constitutional claim with a colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454, 106 S.Ct. 2616, 2627, 91 L.Ed.2d 364 (1986) (plurality opinion); *see also McCleskey v. Zant*, — U.S. —, —, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991); *Williams v. Lynaugh*,

---

**4.** On appeal, Sawyer raised only three challenges to his conviction and sentence: 1) whether he was denied effective assistance of counsel; 2) whether he was denied due process because the trial court failed to comply with a state law requiring that counsel assigned in a capital case must have been admitted to the bar at least five years; and 3) whether prosecutorial misconduct erroneously misled the jury as to its role in the death penalty determination. In addition, Sawyer challenged the district court's application of a prejudice requirement on the claim of prosecutorial misconduct.

**5.** The Court considered only whether a prisoner whose murder conviction became final before the decision in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which prohibits the imposition of a death sentence where the prosecutor's closing arguments diminished the jury's sense of responsibility for imposing a capital sentence, is entitled to use that decision to challenge his capital sentence in a federal habeas corpus action. The Court ruled that he could not, because *Caldwell* announced a new rule and did not come within the exception for rules necessary for fundamental fairness of the criminal proceeding.

837 F.2d 1294, 1295 (5th Cir.1988), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3260, 106 L.Ed.2d 605 (1989).

■ If the petitioner raises a new claim in a second or successive habeas petition, we may review that claim on the merits only if the petitioner's failure to raise the claim in the prior petition was not due to inexcusable neglect. *See Moore v. Butler,* 819 F.2d 517, 519 (5th Cir.), *cert. denied,* 482 U.S. 920, 107 S.Ct. 3201, 96 L.Ed.2d 688 (1987) (quoting *Jones v. Estelle,* 722 F.2d 159, 163 (5th Cir.1983) (*en banc*), *cert. denied,* 466 U.S. 976, 104 S.Ct. 2356, 80 L.Ed.2d 829 (1984)). The state bears the burden of pleading abuse of the writ. *See id.* Once the state has met its burden of pleading, the petitioner must disprove that he has abused the writ by showing cause for failure to bring the claim in the first federal habeas petition, and actual prejudice that results from the errors that gave rise to the claim. *McCleskey,* 111 S.Ct. at 1470.

■ In order to demonstrate cause, the petitioner must show that the failure to raise the claim in his first petition was due to some objective external factor such as interference by officials. *Id.* (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). The court must examine "whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process." *Id.* — U.S. at —, 111 S.Ct. at 1472. "Omission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim." *Id.* Prejudice requires a showing of actual prejudice amounting to a denial of fundamental fairness. *Carrier,* 477 U.S. at 494, 106 S.Ct. at 2648.

■ A court need not consider whether there is actual prejudice to the petitioner when he fails to show cause. *McCleskey,* — U.S. at —, 111 S.Ct. at 1474 (citing *Carrier,* 477 U.S. at 494, 106 S.Ct. at 2648). "If the petitioner cannot show cause, the failure to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim." *Id.* — U.S. at —, 111 S.Ct. at 1470. A "fundamental miscarriage" implies that the "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649. *McCleskey* harmonized the *Kuhlmann* "colorable showing of factual innocence" requirement with the "actual innocence" that a petitioner must show to avoid the cause and prejudice requirement for abusive claims. Thus, a showing of actual innocence triggers our authority to consider the merits of abusive claims that fail the cause and prejudice requirement as well as successive claims.

### B. The Actual Innocence Exception

The Supreme Court first considered actual innocence as a limitation on hearing successive federal habeas petitions in *Kuhlmann,* which sought to clarify this "ends of justice" requirement implicit in 28 U.S.C. § 2244(b),[6] which restricts a federal court's authority to review the merits of a successive claim. In balancing a prisoner's interest in testing the constitutionality of his confinement against the state's interest in the administration of its criminal statutes, and particularly in the finality of its judicial decisions, a four-Justice plurality determined that the ends of justice required "federal courts to entertain such petitions

---

**6.** *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) drew the "ends of justice" limitation from the version of 28 U.S.C. § 2244 in effect at that time. *Kuhlmann,* 477 U.S. at 448, 106 S.Ct. at 2624. The current version of the statute explicitly incorporates the phrase into subsection (a), which deals with federal prisoners, but not into subsection (b), which deals with state prisoners. *See* 28 U.S.C. § 2244(a)–(b) (1988). Nonetheless, *Kuhlmann* holds that § 2244(b) continues to require an "ends of justice" inquiry because of the limited discretion it still affords to federal courts presented with successive state claims. *See* 477 U.S. at 451, 106 S.Ct. at 2625.

only where the prisoner supplements his claim with a colorable showing of factual innocence." The *Kuhlmann* plurality drew from Judge Friendly's seminal article on federal habeas review [7] and *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in articulating a standard for assessing factual, or actual, innocence:

> [T]he prisoner must show a fair probability that, in light of all of the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongfully excluded or to have become available only after trial, the trier of fact would have entertained a reasonable doubt as to his guilt.

*Kuhlmann*, 477 U.S. at 455 n. 17, 106 S.Ct. at 2627 n. 17 (quoting Friendly, *supra* note 7, at 160).

On the same day *Kuhlmann* was decided, the Supreme Court also considered two habeas cases presenting procedurally defaulted claims. A petitioner ordinarily must demonstrate cause for his abuse of the writ and prejudice resulting from the alleged constitutional error before a federal court can address the merits of a claim brought for the first time in a second habeas petition. A majority held that a showing of actual innocence would excuse a petitioner from the cause and prejudice requirement. *See Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986); *Smith v. Murray*, 477 U.S. 527, 537–38, 106 S.Ct. 2661, 2667–68, 91 L.Ed.2d 434 (1986). The Court reasoned that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent," failure to consider a procedurally defaulted habeas claim would result in a "fundamental miscarriage of justice." *Carrier*, 477 U.S. at 495–96, 106 S.Ct. at 2649.

*Smith* specifically considered the application of this exception in the capital sentencing context. The *Smith* Court acknowledged that "the concept of 'actual,' as distinct from 'legal' innocence does not translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense." 477 U.S. at 537, 106 S.Ct. at 2668. Nonetheless, the Court decided that Smith's claim did not fall within the actual innocence exception, because, as the alleged error neither introduced false facts nor precluded the development of true ones, it did not present even "the risk of a manifest miscarriage of justice." *Id.* at 538, 106 S.Ct. at 2668.

In arriving at this conclusion, the Court focused specifically on whether the allegedly erroneous admission of the psychiatrist's testimony undermined the accuracy of the jury's factual finding that Smith was a continuing threat to society, a statutory aggravating circumstance. The Court assumed that the challenged evidence had been improperly admitted, and that but for its admission, the jury probably would have imposed a life sentence instead of death. *Id.; see also Johnson v. Singletary*, 938 F.2d 1166, 1182 (11th Cir.1991) (en banc) (observing that *Smith* Court assumed that Smith was "legally innocent"). In analyzing Smith's claim, the Court asked "whether *in fact* petitioner constituted a continuing threat to society." *Smith*, 477 U.S. at 538, 106 S.Ct. at 2668. The way that the Court framed this question indicates that an inquiry into accuracy was relevant specifically because the challenged finding of fact, if incorrect, could have led the jury to err in finding Smith guilty of an aggravating circumstance under Virginia law.

The Court's ultimate refusal to consider Smith's claim on the merits also indicates the necessary content of a showing of actual innocence of the death penalty. Virginia requires the jury to find at least one aggravating circumstance before it can recommend a death sentence. *See Briley v. Bass*, 584 F.Supp. 807, 840 (E.D.Va.), *aff'd*, 742 F.2d 155 (4th Cir.), *cert. denied*, 469

---

7. Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142 (1970).

U.S. 893, 105 S.Ct. 270, 83 L.Ed.2d 206 (1984). If Smith had challenged both of the aggravating circumstances that the jury found to recommend his death sentence, the jury could have imposed a sentence of which Smith was actually innocent, because the absence of both of the statutory aggravating circumstances would have prevented the jury from imposing the death penalty as a matter of state law. In dismissing Smith's claim, the Court seems to have implied that a claim that challenged only one aggravating circumstance was "unrelated to [actual] innocence," and thus failed to present the risk of a fundamental miscarriage of justice. *See* 477 U.S. at 539, 106 S.Ct. at 2669; *accord Johnson*, 938 F.2d at 1182 (en banc).

In cases following *Smith,* the Supreme Court has continued to adhere to the view that actual innocence requires more than showing a constitutional error, even one that results in the admission of false or misleading facts, and even if the verdict or sentence would have been different absent the error. In *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989), the Court implied that a petitioner does not show actual innocence by raising a claim that affects the fundamental fairness or the accuracy of a proceeding even if it presents a likelihood that the error actually influenced the sentence imposed. The Court observed that while "the trial judge in this case found an equal number of aggravating and mitigating circumstances," this fact was insufficient to show that an error in sentencing instructions caused a fundamental miscarriage of justice. *Id.* at 412 n. 6, 109 S.Ct. at 1217–18 n. 6. In the same discussion, the majority criticized as overbroad Justice Stevens' dissenting view that a fundamental miscarriage of justice occurs whenever "there is a substantial claim that a constitutional violation undermined the accuracy of the sen-

tencing decision." *Id.* at 423, 109 S.Ct. at 1223–24 (Stevens, J., dissenting).

This past term, the Court again recognized the actual innocence exception in *McCleskey,* in the context of abusive claims. *McCleskey* reiterated that a fundamental miscarriage of justice is shown only in those "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." —— U.S. at ——, 111 S.Ct. at 1470 (citing *Carrier*). After observing that the fundamental miscarriage of justice exception "gives meaningful content to the otherwise unexplained 'ends of justice' inquiry" mandated by *Sanders,*[8] the Court embraced the *Kuhlmann* plurality's "factual innocence" inquiry as the primary source of this content. *See id.* —— U.S. at ——, 111 S.Ct. at 1471.

Although this circuit has addressed claims involving the actual innocence exception in the sentencing context before, we have not yet endeavored to define it precisely.[9] In *Cuevas v. Collins,* 932 F.2d 1078 (5th Cir.1991), we held that the petitioner did not come within the exception, and merely observed that his claim did not present "sufficient risk of an erroneous sentence as to implicate actual innocence." *Id.* at 1083. We addressed the issue in two other cases, but found again that the weak factual support for those claims did not compel a considered analysis of the exception.[10]

At this juncture, we believe that it is helpful to set forth a standard for assessing whether successive and abusive claims qualify for this rare exception. We extract the standard from Supreme Court case law, examine the rationale supporting it, and apply it to this case.

One can fairly view with skepticism the proposition that a convicted defendant can be actually innocent of a sentence which is normally left to the discretion of the

**8.** 373 U.S. 1, 15–17, 83 S.Ct. 1068, 1077–78, 10 L.Ed.2d 148 (1963).

**9.** We have considered the application of the exception in the guilt-innocence phase. *See, e.g., United States v. Shaid,* 937 F.2d 228, 232–36 (5th Cir.1991) (en banc).

**10.** *See Jones v. Whitley,* 938 F.2d 536 (5th Cir. 1991); *Bird v. Collins,* 934 F.2d 629 (5th Cir. 1991).

judge virtually free of substantive control or guidance. But the Supreme Court has recognized that in an important and controlling respect, a death sentence is different from any other kind of sentence. The Supreme Court has held that in order to comply with the Eighth Amendment, a death sentence must be imposed under a structure that specifically narrows the circumstances under which it may be imposed. *E.g., Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

Many states, including Louisiana, have complied with the Court's construction of the Eighth Amendment by adopting statutes that set forth certain aggravating circumstances, at least one of which must be found before the jury is authorized to impose the death penalty. As the Court recognized in *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), with respect to the Missouri death penalty statute, "[b]y enacting a sentencing procedure that resembles a trial on the issue of guilt or innocence, Missouri *explicitly requires* the jury to determine whether the prosecution has 'proved its case.'" *Id.* at 446, 101 S.Ct. at 1862 (emphasis in the original). Because of the similarity between a trial on guilt or innocence and a capital sentencing proceeding, the Court held that the protection afforded by the Double Jeopardy Clause to one acquitted by a jury is also available at his retrial to one who has earlier been, in effect, acquitted of a death penalty. *Id.* We think that the Court's willingness in *Smith* to consider Smith's claim that he was actually innocent of his death sentence is premised on the distinction that the Court drew in *Bullington* between a death sentence and other sentences, and that distinction informs our

view as to the content of the standard we set forth today.

Justice Powell's cogent dissent in *Bullington* did not necessarily disagree with the majority's explanation of capital sentencing. Instead, Justice Powell chose to emphasize the inherent difference between reviewing the validity of the sentencing phase and that of the guilt-innocence phase of a criminal trial:

> Underlying the question of guilt or innocence is an objective truth: the defendant, in fact, did or did not commit the acts constituting the crime charged. From the time an accused is first suspected to the time the decision on guilt or innocence is made, our criminal justice system is designed to enable triers of fact to discover that truth according to law. But triers of fact can err, and an innocent person can be pronounced guilty. In contrast, the law provides only limited standards for assessing the validity of a sentencing decision. The sentencer's function is not to discover a fact, but to mete out just deserts as he sees them. Absent a mandatory sentence, there is no objective measure by which the sentencer's decision can be deemed correct or erroneous *if it is duly made within the authority conferred by the legislature.*

*Id.* at 450, 101 S.Ct. at 1864 (1981) (Powell, J., joined by Burger, C.J., and White and Rehnquist, JJ., dissenting) (emphasis added). Both the majority and the dissent in *Bullington* guide our analysis. The similarities between a guilt-innocence determination and a capital sentencing decision allow us to translate actual innocence into the sentencing phase; the differences inform the manner in which we review a claim of actual innocence of a capital sentence.

■ A claim of actual innocence must do more than "call into question the reliability of an adjudication of legal guilt," *Carrier,* 477 U.S. at 495, 106 S.Ct. at 2649, or here, the reliability of the jury's imposition of

the death penalty. *See Adams*, 489 U.S. at 412 n. 6, 109 S.Ct. at 1217–18 n. 6. It must challenge the facts which triggered the jury's authority to impose the death penalty. In assessing when a habeas petitioner can be actually innocent of the crime of which he was convicted, the plurality in *Kuhlmann* focused on whether the petitioner had shown a fair probability that, in the light of all the evidence, the trier of fact would have entertained a reasonable doubt as to his guilt.[11] Translating *Kuhlmann*'s guilt-innocence phase test to the sentencing phase, then, we must require the petitioner to show, based on the evi-

dence proffered plus all record evidence, a fair probability [12] that a rational trier of fact [13] would have entertained a reasonable doubt as to the existence of those facts which are prerequisites under state or federal law [14] for the imposition of the death penalty.[15] That is, a petitioner is not actually innocent of the death penalty unless he demonstrates, under all the evidence that was and arguably should have been presented, that the jury would not have been authorized to sentence him to death. *See Bullington*, 451 U.S. at 439, 101 S.Ct. at 1858 (distinguishing a death sentence proceeding from other sentencing procedures in which there is "no separate sen-

**11.** The *Kuhlmann* plurality incorporated Judge Friendly's proposal in articulating this standard. *See* 477 U.S. at 455 n. 17, 106 S.Ct. at 2627 n. 17 (specifying that "all of the evidence" includes " 'that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial' " (quoting Friendly, *supra* note 7, at 160)).

**12.** The use in *Kuhlmann* and succeeding Supreme Court cases, and our use, of the term "fair probability" as an indication of the threshold that petitioner must reach does not in any way detract from the premise of *Jackson* that the evidence is sufficient so long as a rational juror can find a pathway through all the evidence to convict (or, as here, sentence) the defendant. Under *Jackson*, a trier of fact is free to choose among reasonable constructions of the evidence. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

**13.** We have used the term "trier of fact" consistently throughout this opinion, and recognize that usually the jury is the trier of fact. Depending on how a state allocates the responsibility for complying with its own as well as federal requirements in its death sentencing scheme, however, the jury, trial judge, or appellate court may have shared or independent obligations to ensure that a death sentence is imposed in accordance with state or federal law. In some circumstances, a trial judge or an appellate reviewing body alone may bear the responsibility for determining the existence of one or more facts that must be found under state or federal law before the death sentence can be imposed. In an instance dealing with such a determination, the inquiry would be whether the body vested with the responsibility for making that determination in the first instance probably

would have entertained a reasonable doubt as to the fact that it is required to determine. *See, e.g., Enmund v. Florida*, 458 U.S. 782, 801, 102 S.Ct. 3368, 3378–79, 73 L.Ed.2d 1140, 1154 (1982) (reversing Florida Supreme Court decision to affirm death sentence absent trial court finding that accomplice, who did not kill or attempt to kill, intended killing or use of lethal force); *Gregg v. Georgia*, 428 U.S. 153, 191–92, 204–05, 96 S.Ct. 2909, 2933–34, 2939–40, 49 L.Ed.2d 859 (1976) (plurality) (indicating that sentencing authority can be allocated to either court or jury, and holding that state supreme court's capital sentence review procedure assisted in preserving the constitutionality of the state sentencing scheme).

**14.** There are several circumstances under which the death penalty is unavailable as a matter of constitutional law. *See, e.g., Thompson v. Oklahoma*, 487 U.S. 815, 857–78, 108 S.Ct. 2687, 2711, 101 L.Ed.2d 702 (1988) (O'Connor, J., concurring) (persons under 16 years of age when they commit capital offense cannot receive death penalty unless legislature clearly includes them by setting a lower minimum age); *Tison v. Arizona*, 481 U.S. 137, 157–58, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987) (minor participation in felony underlying felony murder conviction cannot support death penalty absent finding that defendant exhibited at least reckless disregard for human life); *Ford v. Wainwright*, 477 U.S. 399, 409, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986) (Constitution prohibits executing death sentences of insane persons for the duration of their insanity); *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality) (rape conviction cannot serve as basis for death sentence).

**15.** *See also Johnson*, 938 F.2d at 1183. In *Johnson*, the Eleventh Circuit recently proposed a standard to assess whether a petitioner is actually innocent of the death penalty:

tencing proceeding at which the prosecution [is] required to prove—beyond a reasonable doubt—additional facts in order to justify the particular sentence.")

*Jackson v. Virginia,* which provided the foundation for the *Kuhlmann* test, carefully limited the role of courts in conducting a sufficiency of the evidence review. *Jackson* directed the reviewing court to examine all of the evidence "in the light most favorable to the prosecution." 443 U.S. at 319, 99 S.Ct. at 2789. The Court explained that it imposed this requirement so that the review would "impinge[ ] on 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Id.* The Court further reasoned:

> The question of whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was reached. Just as the standard announced today does

not permit a court to make its own subjective determination of guilt or innocence, it does not require scrutiny of the reasoning process actually used by the fact finder—if known.

*Id.* n. 13. The core concern of the *Jackson* Court, in designing the sufficiency review, was to insulate the discretionary function of the jury from judicial scrutiny. This concern constrains our review of a claim of actual innocence of a capital sentence to only those facts which provide the predicate for the jury's authority to assess the death penalty.

Like the petitioner in *Smith,* Sawyer maintains that his claims, if true, would render him innocent of the death penalty.[16] Therefore, we must consider, based on the new evidence he presents viewed in conjunction with all of the evidence admitted in the trial court, whether a fair probability exists that a rational trier of fact would have entertained a reasonable doubt as to

[A] petitioner may make a colorable showing that he is actually innocent of the death penalty by presenting evidence that an alleged constitutional error implicates *all* of the aggravating factors found to be present by the sentencing body. That is, but for the alleged constitutional error, the sentencing body *could not* have found *any* aggravating factors and thus the petitioner was ineligible for the death penalty. In other words, the petitioner must show that absent the alleged constitutional error, the jury would have lacked the discretion to impose the death penalty

. . . .

*Id.* (emphasis in original). The test we set forth here emerges from the same fundamental concerns discussed by the *Johnson* en banc majority. In devising a framework for reviewing actual innocence of the death penalty, we recognize that the broad discretion afforded to sentencing bodies under both federal and state law leaves few objective criteria upon which we can decide whether a sentencer had the authority to impose the death penalty. *See id.* Our test also recognizes that both state and federal requirements imposed on death penalty schemes affect the inquiry into actual innocence of the death sentence. *See id.* at 1186, 1191, 1194–95 (Tjoflat, C.J., concurring and dissenting).

16. Sawyer urges us to apply a test that first would inquire into whether the alleged constitutional violations in the sentencing phase of his trial "precluded the development of true facts [or] resulted in the admission of false ones." (quoting *Smith,* 477 U.S. at 538, 106 S.Ct. at

2668). He would then have us ask whether there is a fair probability that, but for this alleged error, the trier of fact would not have imposed the death penalty. We do not believe that this test accurately interprets the meaning of actual innocence as presented in *Smith* and cases following. It is true that the *Smith* majority concluded that refusal to consider the merits of Smith's claim would not pose the *risk* of a fundamental miscarriage of justice because the alleged error neither caused the admission of false facts nor precluded the development of true ones. *See* 477 U.S. at 538, 106 S.Ct. at 2668. It is clear, however, that the Court did not intend *Smith* to stand for the converse proposition—that the admission of false facts or the omission of true facts would end the inquiry into whether a petitioner is actually innocent of the death penalty. *Adams* explains that actual innocence requires *more* than a showing that a constitutional violation undermined the accuracy of the sentencing decision. *See* 489 U.S. at 412 n. 6, 109 S.Ct. at 1217–18 n. 6; *see also Johnson,* 938 F.2d at 1182 (factual inaccuracy "may well be necessary to a claim of actual innocence," but is insufficient unless that inaccuracy affects the sentencer's authority to impose the death penalty). Because the test that Sawyer proposes would make actual innocence indistinguishable from a showing of actual prejudice, and thereby turn the exceptional case into an "all too ordinary one," *id.,* we do not adopt it. *See Carrier,* 477 U.S. at 495, 106 S.Ct. at 2649 (clearly distinguishing between actual innocence and actual prejudice, and re-empha-

the existence of any of those facts which are prerequisites under Louisiana or federal law to the imposition of his death penalty. In order to assess how a rational trier of fact would view the newly proffered evidence, we must understand how the state statute directs the trier of fact to study the evidence.

■ Under the Louisiana capital sentencing scheme, the jury is authorized to assess the death penalty so long as it finds at least one statutory aggravating circumstance beyond a reasonable doubt. La. Code Crim.Proc.Ann. Art. 905.3 (West Supp.1991). After it so finds, the statute imposes a procedural requirement that the jury consider any mitigating circumstances before it assesses the death penalty. *Id.*[17] The statute provides a definitive list of aggravating circumstances, Art. 905.4, and a nonexhaustive list of mitigating circumstances. Art. 905.5; *see* 905.5(e) (providing for consideration of "[a]ny other relevant mitigating circumstance"). The finding of one or more mitigating circumstances does not foreclose the jury from imposing the death penalty in the presence of at least one aggravating factor. *See* Art. 905.3. Under the Louisiana scheme, therefore, a rational juror conceivably could choose to give no weight to any of the mitigating factors and impose the death penalty so long as it has found, beyond a reasonable doubt, the existence of a single aggravating circumstance.

■ It is clear, under the Louisiana scheme, that additional mitigation evidence cannot detract from the jury's ability to find any aggravating factor which supported its imposition of the death penalty. The only factual prerequisite to assessing the death penalty imposed by Louisiana law that is relevant here is the finding of an aggravating circumstance beyond a reasonable doubt. In applying the *Jackson v. Virginia* standard of review to a Louisiana death sentence, therefore, we must ask whether a fair probability exists, in light of the evidence tendered to the court on this second habeas review, when examined in conjunction with all the record evidence, that a rational trier of fact would entertain a reasonable doubt as to the existence of each and every one of the aggravating circumstances found by the jury when it originally imposed the death penalty.[18]

Only by demonstrating that a fair probability exists that the jury could not have sentenced him, i.e., would not have been authorized to sentence him, to death as a matter of law can Sawyer show that he is actually innocent of the death penalty. The jury that recommended Sawyer's death sentence found

(1) that [Sawyer] was engaged in the perpetration of aggravated arson; (2) that the offense was committed in an especially heinous, atrocious and cruel manner; (3) that [Sawyer] was previously convicted of an unrelated murder and sentenced defendant to death. On appeal, this court found that the last aggravating circumstance was not supported by the evidence....

*Sawyer v. State*, 442 So.2d 1136 (La.1983), *cert. denied*, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984). Therefore, in order

---

sizing that a showing of actual prejudice without showing cause would not permit a court to review the merits of a procedurally defaulted habeas claim); *see also McCleskey*, 111 S.Ct. at 1474–75 (finding that because petitioner lacked cause, the court did not need to consider whether he "would be prejudiced by his inability to raise the alleged *Massiah* [*v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)] violation at this late date," and also concluding that petitioner could not "demonstrate that the alleged *Massiah* violation caused the conviction of an innocent person").

**17.** *See also State v. Sonnier*, 380 So.2d 1, 8 (La.1979) (reversing death sentence in light of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and jury's "apparent disregard" of several mitigating factors).

**18.** Only aggravating factors predicate the jury's authority to assess the death penalty under Louisiana law. Therefore, if we were to entertain a claim based on mitigation evidence, we would be compelled to scrutinize the jury's deliberative process, an exercise that the *Jackson* Court explicitly forbade. *See* 443 U.S. at 319 n. 13, 99 S.Ct. at 2789 n. 13.

to show actual innocence of the death penalty, Sawyer must demonstrate that his newly proffered evidence, when viewed in conjunction with the record evidence, would lead a rational trier of fact to entertain a reasonable doubt as to the findings of both aggravated arson and the "especially heinous, atrocious and cruel manner of death."

## C. Claim 1

In his first claim, Sawyer alleges that he was denied effective assistance of counsel and an opportunity for a meaningful and individualized sentencing determination because his trial counsel failed to investigate mitigating evidence and to obtain expert mental health testimony and present such testimony at the sentencing phase of his trial in mitigation of the death penalty. Sawyer specifically raised this same ground for relief in his first habeas petition, and the claim was rejected on its merits. Sawyer now presents additional substantial evidence showing his organic brain damage, moderate mental retardation, and various other mental disorders, as well as childhood abuse and neglect. Specifically, Sawyer shows that he was hospitalized in four mental health facilities, that he received shock therapy, and that he was adjudicated incompetent by the State of Tennessee in 1967. Further, newly submitted mental evaluations suggest that Sawyer's organic brain damage impairs his ability to control his actions. Because Sawyer admits that he raised the claim of ineffective assistance of counsel at the sentencing phase in his prior petition and that it was rejected on the merits, he must supplement his claim by showing a fair probability that a rational trier of fact would have

entertained a reasonable doubt as to the existence of those facts which are prerequisites under Louisiana and federal law for the imposition of the death penalty.

Sawyer asserts that the incompetence of his trial counsel resulted in the introduction of false and misleading facts and precluded the development of true facts concerning his mental status and psychological background. These factual inaccuracies, he claims, foreclosed the jury from considering a statutory mitigating circumstance that should have been applied to his case.[19] Sawyer contends that but for these errors of trial counsel, the outcome of the jury's sentencing deliberations would have been different.

██ Under Louisiana law, mitigation evidence, without more, cannot suffice to demonstrate that a petitioner is actually innocent of the death penalty. Because this evidence does not implicate the validity of the two aggravating circumstances which the jury found in order to impose Sawyer's death sentence, a rational trier of fact still could have recommended the death sentence. Consequently, we must reject this claim as successive without addressing its merits.

## D. Claim 2

██ In his second claim, Sawyer alleges that the issue of his competence to stand trial, although raised at the time of his trial, was not adequately resolved because the sanity commission rendered an incompetent evaluation. Because Sawyer raises this claim for the first time in his second petition for habeas corpus, we may consider it only if he has not abused the writ. Sawyer does not contend that the government or some other external factor obstructed his ability to raise the issue of his incompetency to stand trial in his first fed-

---

**19.** The relevant mitigating circumstance is as follows:

At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication[.] La.Code Crim.Proc.Ann. art. 905.5(e). As the State of Louisiana points out, Sawyer did

present a defense of toxic psychosis due to alcohol ingestion when he was tried. He did not, however, raise the issue of his organic brain disorder in his initial trial. Either or both of these defenses, if accepted by the jury, would qualify for this statutory mitigating circumstance.

eral habeas petition. Sawyer admits that he had been adjudicated incompetent on two separate occasions before he stood trial, and that he had been diagnosed as having moderate retardation and chronic brain syndrome as early as 1965. This type of information could have been discovered through reasonable investigation at or before the time the first habeas petition was filed. We agree with the district court that Sawyer fails to show cause for not raising this claim in his first habeas petition.

Sawyer urges us to consider incompetency to stand trial as equivalent to being actually innocent of his conviction and sentence. Essentially, Sawyer is contending that the alleged Fourteenth Amendment due process violation that caused him to stand trial despite his mental incompetency yields a showing of actual innocence because, but for the constitutional error, he would not have been convicted and sentenced. He does not, however, argue that he was actually innocent of the murder, or of any of the facts which led the jury to find the two valid statutory aggravating circumstances. Since Sawyer does not challenge the critical factual bases for his conviction or sentence, we dismiss this claim without addressing its merits.

### E. Claim 3

In his final claim, Sawyer alleges that the State hid exculpatory evidence in violation of Sawyer's rights under the Sixth, Eighth, and Fourteenth Amendments. Sawyer asserts that despite a pre-trial request for "any exculpatory evidence favor-

able to the defendant," the State concealed that: 1) its key witness, Cynthia Shano, was promised immunity in exchange for her testimony; 2) Wayne Shano, the four-year-old son of Cynthia Shano, told a police detective that Sawyer did not set Arwood on fire and tried to stop Lane from doing so; 3) Cynthia Shano knew Charles Lane prior to the commission of the crime; 4) Cynthia Shano lied when she testified at trial that she does not drink; and 5) the police discovered another can of lighter fluid at the house the day after the crime was committed.[20]

Sawyer did not raise this claim in his first petition, and the district court rejected the claim because it determined that Sawyer failed to show cause for this omission. Sawyer's claim rests on hearsay statements recalling incidents that happened ten years ago. He does not present a convincing argument that the State obstructed his counsel from deposing these witnesses either at the time of his criminal trial or his first habeas petition. Indeed, since the State opened its files to Sawyer's counsel when he filed his first federal habeas petition, he cannot assert that any external obstacle barred his access to this information. Because the State did not prevent Sawyer from having access to the statements and other materials on which he now bases his claim, he does not show that he could not have obtained, by reasonable means, "a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process." *McCleskey*, 111 S.Ct. at 1470.

---

**20.** Sawyer submits seven affidavits to support his allegation that Shano was promised immunity. The affiants declare that Shano either told them or told someone else who repeated to them that she made a deal with the State to testify against Sawyer in order to save herself. Another affidavit supports Sawyer's allegation that Wayne Shano exculpated Sawyer. Diane Thibodeaux, a close friend of Cynthia Shano, states in her affidavit that she was present when the police detective interviewed Wayne Shano, and that Wayne said "Daddy tried to help the lady" [Wayne Shano called Robert Sawyer "Daddy", but Sawyer was not Wayne's father.] and

that the "other man" had lit Arwood on fire. A 1981 letter from William Rausch to Shano supports Sawyer's claim that Cynthia Shano knew Charles Lane prior to the murder. Rausch wrote the letter while he was a prisoner at the Jefferson Area Community Correction Center. Rausch wrote that he spoke with Charles Lane in prison and Lane indicated that he was a good friend of Shano's. Finally, Sawyer's claim that Shano lied on the stand about her drinking rests solely on the prosecutor's handwritten notes for his direct examination of Detective Geiling which indicate that the investigating detective smelled the odor of alcohol on Shano.

 

 Nor does this evidence raise a fair probability that a rational trier of fact would have entertained a reasonable doubt as to whether to convict or sentence Sawyer to death. The specific facts that Sawyer now raises do not show that he is innocent either of the murder of Arwood[21] or of both of the valid aggravating circumstances[22] the jury found before recommending the death penalty.

Moreover, Sawyer's effort to attack the credibility of Cynthia Shano, the State's star witness, would not lead a rational trier of fact to entertain a reasonable doubt as to his guilt of the crime or either of the statutory aggravating circumstances underlying his sentence. Regardless of the evidence now presented, the jury still would have retained the discretion to credit Shano's testimony. This evidence does not implicate any of the findings of fact which entitled the jury to convict and sentence Sawyer to death as a matter of law. We cannot say that this newly tendered evidence of bias, when viewed in conjunction with the evidence presented at trial, would lead a rational juror to entertain a reasonable doubt about whether to convict or sentence Sawyer to death. As a result, we dismiss this claim.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment dismissing Sawyer's request for habeas corpus relief and VACATE his stay of execution.

---

**21.** Sawyer need not have been the actual perpetrator of the aggravated arson for a jury to find him guilty of that crime. *See* La.Rev.Stat.Ann. art. 14:24 (defining principals of a crime as all persons who aid and abet in the commission of a crime, whether directly or indirectly). He does not contend that he was not present while Frances Arwood was being burned. Furthermore, he does not deny that his fingerprints were found on a can of lighter fluid at the crime scene, a fact which the jury considered in finding aggravated arson.

**22.** As recounted above, Sawyer beat and scalded Arwood with boiling water. *See also Sawyer v. State,* 442 So.2d 1136, 1140 (La.1983) (pointing to "overwhelming evidence of the heinous nature of the principal offense" in affirming Sawyer's sentence). Nothing Sawyer adduces now contradicts the fact that he participated in torturing Arwood.