Mark A. HOPKINSON, Petitioner,

v.

Duane SHILLINGER, Respondent,

and

the Attorney General of the State of Wyoming, Additional Respondent.

No. C90–249.

United States District Court, D. Wyoming.

Dec. 18, 1991.

Leonard D. Munker, State Public Defender, Cheyenne, Wyo., Martin J. McClain, Columbia, Mo., Norman A. Newlon, Cheyenne, Wyo., Barbara L. Lauer, Asst. Public Defender, Laramie, Wyo., for Hopkinson.

John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., D. Michael Pauling, Asst. Atty. Gen., Cheyenne, Wyo., for Atty. Gen.

## MEMORANDUM OPINION AND ORDER

MATSCH, Judge.*

This is the second petition for a writ of habeas corpus filed in this court by Mark A. Hopkinson, claiming constitutional error in his convictions of four counts of first degree murder and two counts of conspiracy at a trial in September, 1979, and a sentence to death. Three of the murder convictions were for the deaths of Vincent Vehar, Beverly Vehar and John Vehar, resulting from the bombing of their home on August 7, 1977. The fourth murder conviction was for the killing of Jeffrey Lynn Green on May 18, 1979. The death penalty was imposed for the murder of Jeffrey Green.

The Supreme Court of Wyoming affirmed the convictions but reversed the initial death penalty determination in *Hopkinson v. State,* ("Hopkinson I") 632 P.2d 79 (Wyo.1981). A second penalty phase trial was held in May, 1982, again resulting in a penalty of death for the murder of Jeffrey Green. That death sentence was affirmed in *Hopkinson v. State,* ("Hopkinson II"), 664 P.2d 43 (Wyo.1983), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). The petitioner filed a motion for new trial, which was denied. *See Hopkinson v. State,* ("Hopkinson III"), 679 P.2d 1008 (Wyo.), *cert. denied,* 469 U.S. 873, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984). Thereafter, Hopkinson filed a petition for a writ of habeas corpus in the Wyoming Supreme Court which was denied. *State, ex rel. Hopkinson v. District Court,* ("Hopkinson IV"), 696 P.2d 54 (Wyo.), *cert. denied,* 474 U.S. 865, 106 S.Ct. 187, 88 L.Ed.2d 155

(1985). In *Hopkinson v. State,* ("Hopkinson V"), 704 P.2d 1323 (Wyo.), *cert. denied,* 474 U.S. 1026, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985), the Wyoming Supreme Court affirmed the denial of a sentence reduction and other challenges to the petitioner's sentence. Hopkinson filed a second habeas petition which was denied in *Hopkinson v. State,* ("Hopkinson VI"), 708 P.2d 46 (Wyo. 1985). Hopkinson filed a request for transcripts of grand jury proceedings which was denied by the district court and affirmed by the state supreme court in *Hopkinson v. State,* ("Hopkinson VII"), 709 P.2d 406 (Wyo.1985).

Hopkinson's first federal habeas corpus petition under 28 U.S.C. § 2254 was denied in *Hopkinson v. Shillinger,* ("Hopkinson VIII"), 645 F.Supp. 374 (D.Wyo.1986), *supp. opinion,* 648 F.Supp. 141 (D.Wyo. 1986). The Tenth Circuit Court of Appeals affirmed on all grounds except it questioned whether there may have been exculpatory evidence revealed in the investigation by a state grand jury of the Vehar and Green murders conducted after the trial. The Tenth Circuit ordered the district court to review, *in camera,* all of the post-trial grand jury transcripts to determine if they contained any exculpatory information. *Hopkinson v. Shillinger,* ("Hopkinson IX"), 866 F.2d 1185, 1221 (10th Cir.1989). The Court of Appeals granted rehearing *en banc* on the *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) issue in the case and again affirmed. *See Hopkinson v. Shillinger,* ("Hopkinson X"), 888 F.2d 1286 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3256, 111 L.Ed.2d 765 (1990). After complying with the order of remand, the district court found that the transcripts of testimony before the grand jury in post trial proceedings did not contain any withheld exculpatory material. [Saffels, J., Memorandum and Order, August 15, 1989, p. 2.] That order was affirmed by order of the Tenth Circuit. [Logan, J., Order, December 1, 1989, p. 2.]

---

* United States District Court, District of Colora-   do, sitting by designation.

On September 10, 1990, petitioner filed his third habeas corpus petition in the Wyoming Supreme Court. That court denied the petition on September 21, 1990. *Hopkinson v. State*, ("Hopkinson XI"), 798 P.2d 1186 (Wyo.1990).

■ On September 21, 1990, Hopkinson filed this petition for writ of habeas corpus raising five claims of constitutional error. The petitioner contends that the second penalty phase court failed to instruct the jury appropriately on the factual prerequisites required for two of the aggravating circumstances found by the jury: that the murder of Jeffrey Green was "heinous, atrocious, or cruel" and that the murder was committed for pecuniary gain. The challenge to the instructions concerning the "heinous, atrocious, or cruel" circumstance was considered and rejected in *Hopkinson VIII*, 645 F.Supp. at 402; *see also Hopkinson IX*, 866 F.2d at 1214–17, and therefore must be dismissed under Rule 9(b) of the Rules Governing Section 2254 Cases. The petitioner's claim regarding the pecuniary gain circumstance was considered and rejected by the Wyoming Supreme Court in *Hopkinson II*, 664 P.2d at 74. It is dismissed here as legally insufficient under Rule 4 of the applicable rules. The petitioner also argues that the second penalty phase court improperly allowed victim impact evidence, and that Wyoming's selection of lethal injection as the method of execution of a death sentence violates his right to due process and will subject him to cruel and unusual punishment. These claims are also legally insufficient and are dismissed under Rule 4 of the governing rules.

There are two remaining claims to be considered by this court. The first is the petitioner's claim that the second penalty phase jury was precluded from adequately considering mitigating circumstances in imposing petitioner's death sentence in violation of the Eighth Amendment to the United States Constitution under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). This issue was raised for the first time in *Hopkinson XI*, 798 P.2d 1186. The Wyoming Supreme Court rejected the argument, concluding, without explanation, that these cases were distinguishable and not applicable. The second is the petitioner's claim that he was denied due process under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), based on the cumulative effect of allegedly exculpatory evidence withheld by the prosecution. While a similar claim was considered and rejected in *Hopkinson VIII* and *Hopkinson IX*, additional information was discovered by the petitioner since the first federal habeas petition was filed.

### *The Jury Instruction Issue*

■ At the second penalty phase trial, the jury was instructed that the verdict must be unanimous and must represent the considered judgment of each juror. Jury Instruction #5 read as follows:

### INSTRUCTION NO. 5

In determining which penalty is to be imposed on the defendant you shall consider the evidence which has been presented to you. You shall consider, take into account and be guided by the following circumstances if applicable:

The first such circumstances are called "aggravating circumstances" and in this case are limited to the following:

1. The murder was committed by a person under sentence of imprisonment.

2. The defendant was previously convicted of another murder in the first degree.

3. The murder was committed for the purpose of avoiding or preventing a lawful arrest.

4. The murder was committed for pecuniary gain.

5. The murder was especially heinous, atrocious or cruel.

The other circumstances are called "mitigating circumstances." They are as follows:

1. The defendant has no significant history of prior criminal activity.

2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

3. The victim was a participant in the defendant's conduct, or consented to the act.

4. The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.

5. The defendant acted under extreme duress or under the substantial domination of another person.

6. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

7. The age of the defendant at the time of the crime.

8. Any other circumstances deemed to be mitigating.

The jury was told that aggravating circumstances must be found beyond a reasonable doubt, but that mitigating circumstances need not be proved beyond a reasonable doubt. The verdict form called for a "yes" or "no" response to each of the aggravating and mitigating circumstances listed in Instruction # 5. The court in its instructions and on the verdict form permitted the jury to find other mitigating circumstances.

During deliberations, the jury sent the following note to the court:

### Questions to the court

1. Will you require a copy of "findings and recommendations of sentence" from each juror?

2. Does the jury have to be unanimous as to findings of fact for each aggravating or mitigating circumstance?

Note: We recognize a death verdict requires a unanimous vote and only one aggravating circumstance is required; is it possible for different jurors to feel strongly about different circumstances as the basis for their decision?

The court and counsel discussed the note in the presence of the defendant. All agreed that the law required unanimous findings. The defendant and his counsel did not object to the following response from the court:

Each juror was furnished with a copy of the findings and recommendation of sentence merely for their convenience. The only one which will be returned to the Court will be the original signed in accordance with the instructions. Your verdict, as previously instructed, must be unanimous.

On the verdict form the jury answered "yes" to all of the aggravating circumstances and "no" to each of the listed mitigating circumstances. On that portion of the verdict form asking that the jury set forth in writing any other mitigating circumstances found to exist in the case, the following hand-written statements appeared:

8. The torture of Jeff Green may not have been ordered by Mark Hopkinson.

Yes___ No _X_

9. Actions of Mark Hopkinson helped save the life of a prison guard.

Yes _X_ No___

The petitioner contends that the court's instructions prevented individual jurors from weighing mitigating circumstances on which there was not unanimity in recommending the penalty. It is well established that the Eighth Amendment is violated if the sentencer in a capital case is precluded from considering the mitigating effect of any evidence relevant to the penalty issue. *See Eddings*, 455 U.S. at 110, 102 S.Ct. at 874 (sentencing court's refusal to consider evidence that the petitioner suffered a turbulent family history and emotional disturbance as mitigating factors violated Eighth Amendment); *Lockett*, 438 U.S. at 604, 98 S.Ct. at 2964 (statutory scheme that specifically limits the mitigating factors to be considered by sentencer violated the Eighth Amendment).

Pursuant to this principle, the Supreme Court vacated a death sentence in *Mills*, 486 U.S. 367, 108 S.Ct. 1860. In *Mills*, the jurors were required to respond "yes" or "no" on the verdict form as to aggravating and mitigating circumstances unanimously found, and then to weigh the mitigating circumstances against the aggravating circumstances to determine the penalty. The judge instructed the jury that they must answer "no" if they were not unanimous on the aggravating circumstances. The jury was also instructed to answer "yes" or "no" to the mitigating circumstances; but they were not told to mark "no" to those circumstances if they were not unanimous. The Supreme Court concluded that there was a substantial possibility that reasonable jurors understood the instructions to require a "no" answer upon a failure to agree unanimously on a mitigating circumstance, thereby precluding them from weighing that circumstance against aggravating circumstances in the final sentencing decision. Accordingly, one juror may have prevented the eleven others from giving any effect to some mitigating evidence. That created an impermissible barrier to the consideration of mitigating evidence in violation of the Eighth Amendment.

In *McKoy*, 494 U.S. 433, 110 S.Ct. 1227, the jury was specifically instructed to answer "no" to the mitigating circumstances listed on the verdict form if they did not unanimously find the mitigating circumstance proved by a preponderance of the evidence. The jury answered "yes" to two aggravating circumstances and two mitigating circumstances (concerning the defendant's mental capacity) but did not unanimously find other statutory and non-statutory mitigating circumstances considered by them. The Supreme Court followed *Mills* in holding unconstitutional the statutory scheme preventing the jury from giving effect to mitigating evidence unless all jurors agreed that the same mitigating circumstance had been shown.

The petitioner's argument here is that the court's response to the jurors' inquiry required unanimity on each mitigating circumstance; that each "no" answer represented only a disagreement as to the existence of that particular mitigating circumstance; that the jurors felt compelled to disregard those mitigating circumstances in the ultimate penalty decision and that the exclusion of those mitigating circumstances requires vacation of the death sentence under the precedents of *Mills* and *McKoy*.

The respondents argue that the *Mills* and *McKoy* cases may not be followed here because they were decided after the petitioner's conviction and death sentence. In *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Supreme Court held that a "new" constitutional rule of criminal procedure must not be applied retroactively in cases on collateral review. *Teague* defined a new rule as one which "breaks new ground or imposes a new obligation on the State or the Federal Government. To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Id.* at 301, 109 S.Ct. at 1070 (citations omitted). The requirement that the sentencer in capital cases must be free to consider all mitigating factors and circumstances was firmly established in both *Lockett* and *Eddings*. The Eighth Amendment prohibits barriers to consideration of mitigating evidence whether they result from evidentiary rulings, statute, or jury instructions. Thus, *Mills* and *McKoy* are simply different factual applications of that established principle and are applicable here.

The respondents contend that this claim may not now be considered because it was not raised in the first federal petition for habeas corpus and therefore is an abuse of the writ. That equitable bar to relief was recently addressed in *McCleskey v. Zant*, —— U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). There, the Court directed dismissal of a second federal habeas corpus petition on a state conviction because the basis for relief was not claimed in the first petition and the petitioner did not show both a legitimate cause for that failure and actual prejudice from the error relied upon. The Court instructed that this cause and

prejudice standard must be applied unless the petitioner can show that a fundamental miscarriage of justice would result from a failure to consider the new claim.

■■■■■ Excusable neglect requires a showing of some objective factor—some factual or legal basis not reasonably available to counsel. That is difficult here. The petitioner confronts a dilemma. If *Mills* and *McKoy* created a new rule, it is inapplicable under *Teague.* If these cases are simply new applications of an established principle, as this court has found, the petitioner must justify the failure to make the claim in the earlier petition. Counsel have candidly conceded that they did not see the issue earlier.

■■■ While there may be some justification for counsel's lack of foresight because of the peculiar nature of death penalty jurisprudence and the vicissitudes of Supreme Court opinions on the subject, it is insufficient to meet the cause and prejudice standard. Therefore, this claim can be considered only if a failure to do so would be a fundamental miscarriage of justice. The fundamental miscarriage of justice standard was discussed very recently in *Sawyer v. Whitley,* 945 F.2d 812 (5th Cir.), *cert. granted,* —— U.S. ——, 112 S.Ct. 434, 116 L.Ed.2d 453 (1991). There, the Fifth Circuit Court of Appeals adapted the "factual innocence" test from the plurality opinion in *Kuhlmann v. Wilson,* 477 U.S. 436, 454, 106 S.Ct. 2616, 2627, 91 L.Ed.2d 364 (1986), to a death verdict in the following language:

> Translating *Kuhlmann's* guilt innocence phase test to the sentencing phase, then, we must require the petitioner to show, based on the evidence proffered plus all record evidence, a fair probability that a rational trier of fact would have entertained a reasonable doubt as to the existence of those facts which are prerequisites under state or federal law for the imposition of the death penalty. That is, a petitioner is not actually innocent of the death penalty unless he demonstrates, under all the evidence that was presented, that the jury would not have been authorized to sentence him to death.

945 F.2d at 820 (footnotes omitted). That requirement is too restrictive. It transforms the inquiry from an analysis of the probable effects of constitutional error to a showing of a limitation on the authority to impose the death penalty.

In this court's view, the factual innocence test cannot be applied to the penalty phase of a capital case because the decisions concerning guilt and punishment are dynamically different. To decide guilt of the offense charged, a jury analyzes factual evidence to determine whether it proves beyond a reasonable doubt that the accused committed the criminal acts with the requisite intent. That is an objective process. To decide between life and death in sentencing, the jury exercises subjective judgment. A guilty or not guilty verdict is an act of analysis. A penalty verdict of life or death is an act of conscience.

The Supreme Court has recognized this difference by characterizing death penalty cases as unique. In the long line of cases since *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court has attempted to define the boundaries that circumscribe jurors' freedom to decide subjectively while avoiding the undue influence of passion and prejudice.

In this court's view, the miscarriage of justice which could result from a refusal to consider the questions presented in this petition justifies accepting it. Mark Hopkinson has not demonstrated his innocence of murder. Yet, as Chief Justice Raper noted in *Hopkinson I,* the facts of this case "present one of the most bizarre stories in the judicial history of the State of Wyoming." 632 P.2d at 93. The conduct of the prosecution in the trials held in this case and the character of the circumstantial evidence supporting the conviction for the Green murder are so unusual that the state's interest in finality of the decision is outweighed by the need for certainty that the final result was achieved through procedures consistent with the commands of the United States Constitution.

Under *Mills* and *McKoy,* when the jury collectively decides whether to recommend the death penalty, each juror must feel free

to weigh all mitigating evidence that juror believes to exist against the aggravating factors found by all jurors to have been proved by the state beyond a reasonable doubt. The questions from the jury generate the fair inference that during deliberations at least one juror expressed the view that the state had not proved that Mark Hopkinson ordered the torture of Jeff Green. The "no" to the negative question written in on the jury verdict on this subject could be a communication that the jury was not unanimous on a "yes" answer. Thus, one or more jurors may have believed that the evidence did not show that Mark Hopkinson was responsible for the torture of Jeff Green. That is significant because it is apparent from the evidence and the arguments of counsel that the extensive torture of Jeff Green before his death was the basis for characterizing his murder as "especially heinous, atrocious or cruel." The jurors were unanimous in finding that aggravating factor. Yet, if the jurors determined that the killers of Jeff Green acted on their own in torturing him, without any direction from Mark Hopkinson, their view of Hopkinson's conduct could have been qualitatively different. The question of the petitioner's connection with the torture was relevant to the ultimate penalty decision.

The ambiguities in this case are apparent. The court's instructions never specifically addressed the standard applicable to the findings. Instruction No. 3 included the familiar phrasing:

Your verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

Instruction No. 7 read as follows:

INSTRUCTION NO. 7

If you do not find that one or more sufficient aggravating circumstances exist as previously instructed, you should sign the verdict recommending life imprisonment.

If, on the other hand, you find one or more of the sufficient aggravating cir-

cumstances set forth in these instructions, then in order to find that the death penalty is justified, you must find that the aggravating circumstances outweigh any mitigating circumstances found to exist.

In making this determination you must use your reasoned judgment. You must weigh the mitigating circumstances against the aggravating circumstances and in so doing to consider the following:

1. No numerical weight is assigned to any of the mitigating or aggravating circumstances.

2. The enumeration of the aggravating and mitigating circumstances does not indicate the weight to be given to any such circumstance.

3. One mitigating circumstance may be of such a nature as to outweigh one or more aggravating circumstance.

4. One aggravating circumstance may be of such a nature as to outweigh one or more mitigating circumstance.

This was followed by Instruction No. 8, stating, in relevant part:

In order for the defendant to receive the death penalty in this case, the jury must unanimously recommend the death penalty. If the jury is unable to unanimously agree upon the penalty within a reasonable time, the Court will sentence the defendant to life imprisonment.

The verdict form submitted to the jury was entitled "Findings and Recommendations of Sentence." After listing the five aggravating circumstances (each of which the jury answered "yes") the verdict form instructed:

(If you have answered all of the above "no" sign the Verdict and call the bailiff. If you have answered any of the above "yes" go to Part II.)

Part II of the form listed 7 mitigating circumstances. The jury answered "no" to all of them. Part III of the form was headed "Part III. Recommendation" and gave the jury the following alternatives:

Sufficient mitigating circumstances do exist to outweigh the aggravating circumstances and the jury recommends

that the defendant be sentenced to life imprisonment.

That sufficient mitigating circumstances do not exist to outweigh the aggravating circumstances found to exist and the jury recommends that the defendant be sentenced to death.

The word "verdict" was not used in the form submitted to the jury and it was not defined anywhere in the instructions.

Under *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the question to be considered is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." 110 S.Ct. at 1198. An affirmative answer to that question requires a finding that, under all of the circumstances, reasonble jurors would understand that unless all twelve of them agreed that Mark Hopkinson did not order the torture of Jeff Green, none of them could consider that the uncertainty about that fact was a mitigating factor to be weighed against the aggravating circumstances.

█ It is significant that the jury followed the question about a requirement of unanimity with the "note" of explanation. They clearly understood that the ultimate decision on the penalty required a unanimous vote. They asked for guidance concerning the findings of both aggravating and mitigating circumstances. That was the understanding of the court, all counsel and the defendant. The agreed response was intended to communicate a unanimity requirement for all findings and it is reasonable to expect that to be the understanding of the jurors. There was no follow-up question about the method for indicating a failure to agree on the findings. Therefore, it is appropriate to infer that each "yes" and each "no" was by unanimous agreement. Thus, while the court's instructions were incorrect and violated the *Mills/McKoy* principle, the result was not affected by the instructions. The error was harmless.

Additionally, even if it is assumed that the "no" answers on mitigating circum-

stances meant a failure to agree unanimously on each of them, the verdict of death has not been shown to be a fundamental miscarriage of justice. Considering the verdict form in its entirety, there is no fair basis for finding that this jury was doubtful about the decision on death. All of the aggravating circumstances were found unanimously. Any one of them was a legitimate basis for a death verdict under the established law of this case. Assuming that all of the jurors failed to agree that Hopkinson ordered the torture of Jeff Green, thereby preventing some jurors from considering that mitigating circumstance in the jury's collective recommendation, it is unreasonable to believe that circumstance would have made a difference in the ultimate decision. Accordingly, under the only standard available to him in this second federal petition, the petitioner has failed to show that the jury instructions resulted in a miscarriage of justice.

### The Brady Issue

The petitioner claims a deprivation of due process under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The petitioner raised a *Brady* claim in his first federal habeas corpus petition. Both Judge Saffels of the district court and the Tenth Circuit Court of Appeals reviewed alleged *Brady* material in *Hopkinson VIII* and *Hopkinson IX* and, upon remand, Judge Saffels reviewed, *in camera*, transcripts of testimony presented to a grand jury in Uinta County, Wyoming, that continued to investigate the Green murder after the petitioner's first trial and conviction. Judge Saffels concluded that nothing contained in those transcripts was exculpatory so there was no *Brady* violation. Those transcripts have again been presented to this court, *in camera*. They have not been provided to petitioner's counsel.

█ The petitioner's contention now is that the material which was attached to his second federal petition filed in September, 1990, together with the appendices to the petitioner's traverse, filed December 7, 1990, considered in the aggregate with the

material submitted with the first federal habeas petition, including the grand jury transcripts, constitutes a sufficient showing to invalidate the convictions as well as the penalty. Respondents argue that the majority of the petitioner's *Brady* claim is successive and therefore should be dismissed under Rule 9(b) of the governing rules because the petitioner's claim relies, in part, on evidence raised in the first petition. The petitioner counters that new evidence discovered by the defense since the time of the first petition is sufficient to avoid dismissal under Rule 9(b). Because neither Judge Saffels nor the Tenth Circuit had access to the new material submitted with this petition, the *Brady* claim should be considered. Accordingly, this court has evaluated all of the material raised in both petitions, in the context of the evidence presented at both trials, to determine whether the petitioner has been deprived of due process of law by the withholding of exculpatory evidence.

■ The *Brady* doctrine is only applicable to material which was available to the prosecution and not disclosed to the defense. That which is new to both sides should not be considered. The test for materiality established in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 473 U.S. at 682, 105 S.Ct. at 3383. A reasonable probability has been said to be a probability sufficient to undermine confidence in the outcome. *Id.*

■ The application of the *Bagley* test is difficult in this case because Mark Hopkinson was tried and convicted for arranging the murder of Jeff Green before the state filed any charges against any persons for the actual killing of that victim. While it was suggested to the jury, at both the first trial and the second penalty phase trial, through the testimony of the sheriff and by innuendo in the prosecutor's arguments that the state knew who the killers were, no evidence identifying those persons was introduced. The suggested scenario was that Mark Hopkinson wanted Jeff Green killed because he could be a damaging witness concerning the Vehar murders and because Green had given incriminating testimony in Hopkinson's federal trial. Hopkinson was convicted in the federal matter and confined as a federal prisoner in the Federal Correctional Institution, Lompoc, California. The circumstantial evidence was that while a federal prisoner, Hopkinson arranged for Green's murder through Hap Russell. Russell, in turn, contacted Johnny Sueseta who contacted Todd Hall and Todd Hall dealt with the murderers. The chain of circumstances submitted in support of this scenario has some weak links. The prosecution was continuing its investigation through the two trials and afterward. Accordingly, the prosecution itself discovered new material subsequent to the trials. Another complicating factor is that the credibility of the principal witnesses was highly suspect.

The defense strategy was to explain the telephone calls and other evidence supporting the prosecution's theory by suggesting that the conspiracy was not to kill Jeff Green; it was a concerted effort to obtain perjured testimony to use in a motion for new trial on the conviction for which Mark Hopkinson had been imprisoned. The core of that effort was to obtain a perjured affidavit to refute the testimony given by Jeff Green in that matter. That explanation of the evidence was given by defense counsel in his opening statement at the first trial. In countering that alternative explanation of the circumstantial evidence, the prosecution made much of testimony concerning Mark Hopkinson's efforts to get a picture of Jeff Green into the hands of Todd Hall. It was then argued strenuously that a picture is necessary for a contract killing but has nothing to do with a conspiracy to obtain perjured testimony. There was extensive testimony at the trial about efforts to obtain the photograph of Jeff Green and that, finally, his picture was taken from a high school annual and given to Todd Hall.

Todd Hall had been called before a federal grand jury prior to the trial. He took

the Fifth Amendment, but then gave the prosecutors a detailed statement in August, 1979. The lawyers conducting the federal grand jury investigation were the same lawyers who prosecuted this case in the state court. In that statement, Todd Hall said that Hap Russell talked to him about false affidavits, not a plan for murder, and that he, Hall, destroyed the photograph of Jeff Green without giving it to anyone else. Assuming that Todd Hall would have invoked the protections of the Fifth Amendment if called as a witness, the petitioner argues that he could have introduced Hall's statement as evidence because of the unavailability of the witness.

It is difficult to evaluate the impact of such evidence, but it would appear to have little weight since it is, of course, a self serving statement from a person who was himself under suspicion. Hall gave similar testimony before the Uinta County grand jury after the petitioner's first trial. That testimony was reviewed *in camera* by Judge Saffels who found that it was not exculpatory. It is not different from Hall's 1979 statement.

The prosecution called Johnny Sueseta as a witness at the trial. He took the Fifth Amendment on the most relevant questions. The propriety of the prosecution's conduct in calling him has previously been reviewed by the Tenth Circuit Court of Appeals. *See* 866 F.2d at 1205. Sueseta passed a polygraph examination on December 2, 1981, in which he denied any involvement in Green's murder. There is also evidence that Sueseta had previously worked as a government informant, and worked as a government informant in February of 1982 in the investigation of Green's murder. That evidence was reviewed by Judge Saffels and the Tenth Circuit and found not to be exculpatory. *See* 866 F.2d at 1212. Sueseta testified before the Uinta County grand jury on November 21, 1981, and March 4, 1982, denying any involvement in the murder. That grand jury testimony was also reviewed *in camera* by Judge Saffels who determined that it was not exculpatory. The only new evidence concerning Sueseta is an indication in a. sheriff's report that

Sueseta met with one of the prosecutors on the eve of Hopkinson's first trial in 1979, and offered to take a polygraph to demonstrate Sueseta's innocence in the Green murder. Again, the credibility of these denials is affected by the fact that Sueseta himself was a suspect in the murder investigation.

Kristi King was a witness called by the prosecution in the first trial. She testified about the receipt of money in her bank account in San Francisco by arrangements made by Hopkinson and also testified that she returned the money to the petitioner's brother. The materials offered under *Brady* include information that Kristi King had been threatened with prosecution and was promised immunity for her testimony. The credibility of the trial testimony of this witness was not really challenged. It is not apparent to this court how her testimony would have been considered differently if the jury were told that she had been promised immunity under threatened prosecution.

Much is made by the petitioner of investigations directed toward the theory that Joe Vialpando and Al Harrison were the actual contract killers of Jeff Green. The investigatory efforts of Craig W. McLachlin, working as an informant for Charles Robert Collins, a Salt Lake City investigator, are described at great length in question and answer statements submitted as items 41 and 42 in the appendices to the petitioner's traverse. There is little significance to this material. It does not show that Vialpando or Harrison committed the Green murder. The suspicion about them and others as the actual killers does not negate the petitioner's involvement in contracting for the murder. There was evidence generated prior to the first trial that Allen Stewart fit one of the composite drawings of the killers and was investigated as a suspect in the Green killing. That evidence also does not negate Hopkinson's involvement in the killing.

Additional evidence concerning the actual killers of Green consists of the 1981 grand jury testimony of Barbara Harrison that she overheard a telephone conversation be-

tween Al Harrison and Joe Vialpando in the spring of 1979 when they discussed "burning" someone. Harrison testified that she understood "burning" someone to mean killing him. She took and passed a polygraph examination regarding this testimony after the first trial. Again, such evidence does not show that Hopkinson was not involved in Green's murder, and it is not exculpatory.

There is information in a sheriff's report that before the first trial Joe Vialpando was interviewed and denied any acquaintance with Todd Hall, John Sueseta, Mark Hopkinson and Jeff Green. It was reported that Vialpando denied knowledge of any of the circumstances surrounding Jeff Green's death. The petitioner argues that if this evidence had been available, he could have called Vialpando to so testify or introduced the statement to defeat the prosecution's argument that Hopkinson arranged Green's murder through Hap Russell, John Sueseta and Todd Hall. Again, this evidence is the self-serving statement of an individual being investigated for the murder. Vialpando's statements would be persuasive only if it is assumed that he killed Green, a fact not proved at the trial.

There is evidence, generated after the first trial but before the second penalty phase trial, that Joe Vialpando burned his girlfriend, Virgie Vigil, with cigarettes. It is difficult to see how Vialpando's alleged propensity for burning supports an inference that petitioner did not order the killers to burn Green. The evidence is simply not exculpatory of Hopkinson.

A Uinta County sheriff's report said that in May of 1979 Hopkinson called John Owens, an investigator for George Zunker, Hopkinson's attorney in his federal trial, and asked him if he had located Todd Hall. Owens said that he had been advised that Todd Hall had information that could help Hopkinson in his federal case. The petitioner fails to explain how this information could be considered to have been withheld from him. If the report is true, it was the petitioner himself who talked with Owens.

Similarly, the petitioner argues that the prosecution withheld exculpatory evidence consisting of grand jury testimony given by Jeff Brinkerhoff who was also an investigator working with George Zunker. Brinkerhoff testified before a federal grand jury in 1979. The petitioner has provided this court with a summary of that testimony indicating that Todd Hall told Brinkerhoff that Jeff Green had come to Hall asking him if he knew anyone that could blow up a contractor's car in Salt Lake City. That testimony would be relevant to Hopkinson's effort to obtain a new trial in the federal matter. Brinkerhoff testified that he asked Hall to provide him with an affidavit containing this information, but Hall was reluctant to sign a sworn statement. Brinkerhoff also testified that Hopkinson was angry that Hall wouldn't sign an affidavit and wanted Brinkerhoff to coerce Hall into signing it. The petitioner argues that Brinkerhoff's testimony is exculpatory because it supported the defense's contention that the state's evidence revealed only a plot to obtain perjury, not Green's murder. Again, Brinkerhoff was working for the petitioner and Hopkinson fails to explain how this information was kept from him.

Even if the prosecution did withhold this information obtained from Owens and Brinkerhoff, the evidence does not undermine confidence in Hopkinson's conviction for Green's murder as required under *Bagley*. The information these individuals allegedly had would support the testimony of Hap Russell, who testified at the first trial about the alleged perjury scheme. The jury rejected that defense and found that the evidence showed Hopkinson was plotting the murder of Green.

That verdict is supported by a great deal of evidence. Jeff Green's sister testified that Hopkinson told her he was going to kill Green. There was evidence that Hopkinson had gone to great effort to obtain a picture of Jeff Green for Hap Russell, and, prior to Green's death in May of 1979, Hopkinson made several telephone calls to Jennifer Larchick, Hopkinson's friend and Green's neighbor, inquiring about Green's whereabouts, and whether she had seen any cars with Utah license plates. Also, in

May of 1979, Hopkinson began calling Kristi King, an ex-girlfriend living in San Francisco, California, and after several phone calls asked her if he could put some money in her bank account. Hopkinson called Jennifer Larchick on May 19, 1979, the day after Green disappeared, and learned from her that Green was missing. He again called her on May 20th and learned that Green's body had been found. Green's body was found two days before a grand jury was scheduled to begin investigating the Vehar bombing, and Green was scheduled to testify in that matter. On May 21, 1979, the day after Green's body was found, $15,000 of Hopkinson's money was transferred to King's bank account. On May 22nd, a caller identifying himself as "Joe" called King's unlisted telephone number and asked her to deliver the money to him at the airport. King refused. Hopkinson again called her on May 25th, and after failing to convince her to deliver the money, told her that she should send it to his brother, Scott Hopkinson, which she did. In the face of this evidence, Owen's and Brinkerhoff's testimony that Todd Hall was prepared to give perjured testimony to discredit Green does not undermine confidence in Hopkinson's conviction for Green's murder.

The petitioner argues that the evidence discussed above, considered in conjunction with the remaining evidence raised by the petitioner as *Brady* material in his previous federal habeas petition, results in a violation of his right to due process. The previous evidence includes a statement made by Jeff Green that he was afraid of Jamie Hysell, and that he wouldn't live for three days if he testified against Hysell in the state's prosecution of Hysell for the murder of Kelly Wyckhuyse. Hopkinson argued this testimony showed that Hysell might have killed Green. There was also some evidence that someone had tried to kill both Mark Hopkinson and Jeff Green. Both the district court and the Tenth Circuit determined that this material did not satisfy the *Bagley* test. *See Hopkinson IX*, 866 F.2d at 1213. When considered in conjunction with the new evidence present-

ed in this petition, this evidence is entitled to no greater or different weight.

The rest of the evidence raised by petitioner as *Brady* material in the previous petition pertains to the Vehar murder convictions. There were reports made by the federal Bureau of Alcohol, Tobacco, and Firearms naming or indicating other suspects in the Vehar bombing. There was evidence that Vincent Vehar was investigating a farm grant fraud that would have given other parties, including two witnesses who testified for the state at Hopkinson's first trial, a motive to kill Vehar. With respect to this evidence, the Tenth Circuit concluded that it could not undermine confidence in the Vehar murder convictions because those convictions were supported by Mike Hickey's confession that he committed the bombing at Hopkinson's command. 866 F.2d at 1213. Hickey testified at Hopkinson's first trial and his testimony was corroborated by circumstantial evidence. None of the evidence presented in this petition sheds new light on Hopkinson's previous *Brady* claims regarding the Vehar murder convictions.

This court has also reviewed *in camera* the post trial Uinta County grand jury transcripts in light of the evidence presented in this petition. This court finds no basis for disputing the determination of Judge Saffels, affirmed by the Tenth Circuit, that these materials do not contain exculpatory evidence. Accordingly, the petitioner's *Brady* arguments fail.

Upon the foregoing, it is

ORDERED that the order of this court granting petitioner's motion for stay of execution issued September 23, 1990, is vacated, and it is

FURTHER ORDERED that the petition for writ of habeas corpus is denied in its entirety, and it is

FURTHER ORDERED that this civil action is dismissed.