**Robyn Leroy PARKS, Petitioner,**

v.

**Dan REYNOLDS, Warden, Oklahoma State Penitentiary, Susan B. Loving, Attorney General, State of Oklahoma, Respondents.**

No. 92–6082.

United States Court of Appeals, Tenth Circuit.

March 9, 1992.

Certiorari Denied March 10, 1992.

See 112 S.Ct. 1310.

Richard H. Burr (Mandy Welch, Oklahoma Bar Ass'n, Houston, Tex., Terry J. Hull, Oklahoma Bar Ass'n, Norman, Okl., and Julius L. Chambers and Steven W. Hawkins, NAACP Legal Defense and Educational Fund, New York City, with him on the brief), NAACP Legal Defense and Educational Fund, New York City, for petitioner.

Sandra D. Howard (Susan Brimer Loving, Atty. Gen. of Oklahoma, with her on the brief), Asst. Atty. Gen., Chief, Criminal Div., Oklahoma City, Okl., for respondents.

Before HOLLOWAY, TACHA, and BRORBY, Circuit Judges.

TACHA, Circuit Judge.

Appellant Robyn Parks appeals the district court's dismissal of his habeas corpus petition and denial of his request for a stay of execution. Parks contends that the district court erred in dismissing his habeas petition challenging his murder conviction and resulting death sentence. On appeal, Parks raises several arguments, including ineffective representation by his attorney at both the guilt and punishment phase of his trial, the creation of a false impression by the prosecution, and suppression of favorable evidence by the prosecution. Parks also asserts that it would be "a fundamental miscarriage of justice" to execute him. We exercise jurisdiction under 28 U.S.C. § 1291, dismiss Parks' petition, and deny his request for a stay of execution.

## BACKGROUND

### A. *Facts Surrounding the Murder Conviction*

At the trial, the government's case-in-chief established the following. Abdullah Ibrahim, a native of Bangladesh, was at-

tending school in Oklahoma and working part-time at a Gulf gas station in Oklahoma City, Oklahoma. On the morning of August 17, 1977, a motorist who had stopped at the Gulf station at around 4:30 a.m. to buy some cigarettes found the attendant, Ibrahim, dead inside the station booth. Ibrahim's death was caused by a gunshot wound in the chest. No money or other property had been taken from the booth. However, the investigating officers found an unused Gulf gas credit card charge slip in the booth with the letters and figures "XZ–5710" written on it and circled. The police checked out this alpha-numeric combination and ascertained that it corresponded with the license number of an automobile in which Parks at least had a possessory interest, if not strict legal title thereto.

Parks at this point in the investigation became either a prime suspect or a material witness, and it was ascertained that Parks was then in California. In the meantime, the police had contacted a friend of Parks', one James Clegg, and enlisted the latter's aid. Clegg, in Oklahoma, called Parks, in California, on several occasions, and, with Clegg's consent, two phone conversations were tape recorded. In the first of these two recorded conversations, Parks told Clegg that he went to the Gulf station intending to get gas with a stolen credit card and that the attendant came out of the booth and appeared to write down his license number. Fearing that the attendant would "call the law" and also fearing that if the police caught him they would find guns and dynamite [1] that he had placed in the trunk of his car, Parks decided to kill the attendant so that if "he don't be around there ain't nothing he can tell them noway." In this setting, according to Parks, he went to the station booth and shot and killed the attendant while he was standing up.

In Parks' second taped telephone conversation with Clegg, Parks, still in California, described where he had disposed of the murder weapon. Thereafter the police, accompanied by Clegg, went to the described location, which was miles away from the gas station, and recovered a .45 caliber revolver, together with a holster and ammunition, hidden under a bush. Apparently, one shot had been fired from the revolver; the other five cylinders contained live ammunition. Parks was later arrested in California and extradited to Oklahoma. Both of the taped telephone conversations were played for the jury.

At trial, Parks testified in his own behalf and denied killing Ibrahim. He testified that at the time of the killing he was in another place, and a witness, his girlfriend, corroborated his alibi. Parks explained the fact that the license number of his car was found on the unused credit card slip by stating that several days before the homicide he had been in this particular gas station and had purchased gas when he had no money. He said the attendant at that time took down his license number, but that he had returned later on the same date and paid for the gas. Parks also explained his presence in California at the time of his arrest by testifying that subsequent to the date of the killing he had gone to Kansas City, and then to California, in an effort to buy marijuana. Parks also testified that he confessed because his girlfriend and another friend were being held by the police as material witnesses. He decided that if he confessed to Clegg, who he believed was a police informant, his girlfriend and friend would be released, his family would not be harassed, and he would later be able to clear his name. On this general state of the record, a jury convicted Parks of first-degree murder.

During the trial's penalty phase, the defense presented only Parks' father, Ilanders Parks. Ilanders Parks testified that his son was "a happy-go-lucky guy" and did not have any problems. He also stated that his son was involved in a scuffle in high school, but otherwise was not involved in "any kind of violence."

---

1. Parks stated that he was carrying dynamite to blow up the drug house of his "supervisor,"

Codis Mims.

On cross-examination, Ilanders Parks acknowledged that his son had been convicted of robbery by force while in high school. The prosecution also asked Ilanders Parks about his son's burglary conviction, which Ilanders Parks admitted to not knowing about. The prosecution also introduced the testimony of David Bourn, the victim of the robbery by force. Bourn indicated that Parks was the main instigator in the incident and had struck him in the face. In his closing argument, the prosecutor then used all of the evidence introduced in the penalty phase to emphasize Parks' negative character to the jury.

The jury subsequently sentenced Parks to death.

### B. Procedural History of the Murder Conviction

Parks' conviction and sentence were affirmed on direct appeal by the Oklahoma Court of Criminal Appeals, *Parks v. State,* 651 P.2d 686 (Okla.Crim.App.1982), and the United States Supreme Court denied certiorari. *Parks v. Oklahoma,* 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983).

Parks then sought post-conviction relief in the state courts of Oklahoma. The state district court denied relief, and the Oklahoma Court of Criminal Appeals affirmed in an unreported order and opinion. Thereafter, the United States Supreme Court denied certiorari. *Parks v. Oklahoma,* 467 U.S. 1210, 104 S.Ct. 2400, 81 L.Ed.2d 356 (1984).

Parks subsequently was denied habeas corpus relief in the United States District Court for the Western District of Oklahoma by orders dated November 5, 1985 and February 28, 1986. On appeal to this court, Parks raised seven arguments: (1) failure of the state trial court to instruct the jury on a lesser included offense; (2) admission of a prior conviction of Parks for robbery by force and fear; (3) improper comment to the jury by the state prosecutor in the hearing at the penalty phase of the case; (4) error by the trial court in

instructing the jury to disregard "sympathy"; (5) incomplete and misleading instruction on aggravating circumstances vis-a-vis mitigating circumstances; (6) ineffective assistance of counsel at the penalty phase hearing; and (7) failure of the trial court to hold an evidentiary hearing on his claim that Oklahoma's death sentence statutes are applied in a racially discriminatory manner. *Parks v. Brown,* 840 F.2d 1496, 1499 (10th Cir.1987). Initially, we affirmed the district court's decision. *Id.* at 1524. However, on rehearing and sitting en banc, we reversed and vacated Parks' death sentence. *Parks v. Brown,* 860 F.2d 1545 (10th Cir.1988). The United States Supreme Court granted certiorari and reversed. *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). On remand, we denied any additional relief, *Parks v. Saffle,* 925 F.2d 366 (10th Cir. 1991), and the United States Supreme Court denied further review. *Parks v. Saffle,* —— U.S. ——, 112 S.Ct. 213, 116 L.Ed.2d 171 (1991).

Parks then filed a second application for post-conviction relief in Oklahoma County District Court, which was denied. The Oklahoma Court of Criminal Appeals affirmed the denial and denied Parks' application to stay the execution. On February 28, 1992, Parks filed a third application for post-conviction relief in the Oklahoma County District Court, asserting that it would violate the Eighth Amendment to execute someone who is probably innocent. This application is still pending in the state courts. Parks also filed a petition for habeas corpus in the federal district court on February 28, 1992, which the district court dismissed on March 2, 1992 without prejudice because the petition contained both exhausted and unexhausted claims.[2] The district court then permitted Parks to file a third petition for habeas corpus without the unexhausted claim. The district court denied this petition on March 5, 1992 as abusive and successive. Parks now appeals the district court's decision. Parks also

---

**2.** The unexhausted claim is the same claim Parks raised in his third application for post-conviction relief in the state courts, i.e. that it

would violate the Eighth Amendment to execute someone who is probably innocent.

has filed a motion for stay of execution pending the exhaustion and presentation in the district court of his claim of probable innocence.

## DISCUSSION

In this petition, Parks raises a number of constitutional claims. First, he asserts that he was denied effective assistance of counsel at trial. Second, he argues that the prosecutor created a false impression and suppressed favorable evidence. Third, Parks claims that he was denied effective assistance of counsel during the penalty phase. Fourth, he contends that he was deprived of a fair and reliable sentencing determination because the prosecution presented materially inaccurate evidence and suppressed evidence favorable to the defense.

In his ineffective assistance of counsel at trial argument, Parks asserts that effective representation would have shown the following during the trial. Parks asserts that his defense strategy was to try to persuade the jury that his telephone admissions were false, having been made up to deceive James Clegg, and that he was at Elaine Sheets' house during the time the murder took place. To effectuate this strategy, his counsel had to address the evidence against Parks, which included: the credit card form that had Parks' automobile tag number written on it; the telephone conversation with Clegg, in which Parks admitted to killing Ibrahim because he went to the station to buy gas with a hot credit card and Ibrahim wrote down his tag number, making him worried that the police would stop him and find the dynamite in his car with which he planned to kill Codis Mims; and the Colt .45 gun that Parks said was used to kill Ibrahim and that firearms analysis confirmed was at least similar to the gun that fired the fatal bullet.

Parks first asserts that his attorney should have done the following: (1) hired a handwriting expert to determine if the tag number was "XZ–5710" or "XZ–8710"; [3] (2) shown that Ibrahim reported to the Oklahoma City Police that a customer had driven off without paying for gasoline three hours before Ibrahim was shot and that Ibrahim may have tried to write down this vehicle's license number as required by operating procedures of the gas station; (3) shown that Parks would have presented his credit card to Ibrahim only after he had pumped gas, that there was no unaccounted for credit card sale of gasoline that night, and that none of the credit card sales were transacted by Parks; (4) shown that the State's picture supposedly taken by police from the assailant's vantage point was inaccurate and that an accurate picture would have shown that Parks could have seen the credit card slip with the license number on it; (5) shown that Parks' statement in his confession that Ibrahim was standing straight up when he was shot was inaccurate because reconstruction of the scene and the entry of the bullet demonstrate that Ibrahim was bending over; (6) shown that Parks had no reason to kill Codis Mims and put witnesses on the stand on that would have corroborated his close relationship with Mims; (7) shown that the police not only discovered a .45 caliber weapon but also discovered a .44 caliber weapon that they believed could have been used in the murder; (8) hired an expert to examine and testify that the fatal bullet could have been fired from either a .44 caliber or .45 caliber gun; (9) shown that the Colt .45 was so defective that Parks' testimony that the gun was discarded because it did not work right was credible; (10) shown that the condition in which the Colt .45 was found—with only five bullets in a gun with a six-chambered cylinder— was the recommended "full load" for a Colt .45, suggesting that the gun had not been discarded after firing a single shot, but rather had been discarded fully loaded; (11) presented two witnesses, in addition to his girlfriend who was easily impeached, that would have corroborated Parks' alibi by testifying that Parks spent the entire night in Elaine Sheets' house and that

---

3. A handwriting expert hired by Parks has now determined that the number is probably "XZ– 8710," and not "XZ–5710"—the license number of Parks' vehicle.

James Clegg may have used Parks' car on the night of the murder.[4]

Parks claims that the prosecution created the following false impressions: (1) that he could not see the credit card form with the tag number on it at the station from where he was standing; (2) that the fatal bullet was .45 caliber; (3) that the .45 caliber was in good working condition, except for the missing cylinder pin; and (4) that the number of live rounds in the gun when it was found—five, in a gun that would hold six bullets—meant that the sixth bullet was the one fired at Ibrahim. Parks has provided affidavits supporting all of the above. In addition, the affidavits show that the Colt .45 was defective in four ways: its cylinder pin was missing; it was out of alignment even with a cylinder pin in place; its hammer did not lock consistently in place when cocked; and its trigger required only slight pressure to release the cocked hammer.

Parks asserts that the prosecution suppressed the following favorable evidence: (1) that the license number may have been written down before the murder, either when Ibrahim reported someone driving off without paying for gas or a few days earlier when Ibrahim wrote down a black customer's tag number and the customer got very angry—which supports Parks' statement at trial that he had given his license number a few days earlier because he did not have money with him to pay for gas; and (2) that the police discovered a .44 caliber weapon that they believed was associated with the murder. Parks has provided both affidavits and newspaper articles supporting these contentions.

Turning to the penalty phase, Parks asserts that effective counsel would have demonstrated the following: (1) that the incident involving the robbery by force conviction was a product of the racial strife at John Marshall High School; (2) that Parks did not initiate the assault; (3) that Parks may not have actively participated in the assault; and (4) that Parks had a good character as evidenced by a number of close relationships with friends and family.[5]

Further, Parks contends that the prosecution presented materially inaccurate evidence about his conviction for robbery by force. Parks states that the testimony of the victim falsely portrayed Parks as the instigator. Parks also claims that the prosecution suppressed evidence favorable to the defense when it did not present the police report of the robbery by force conviction that would have discredited the victim's characterization of Parks' role in the crime. Thus, Parks argues that his counsel was denied evidence that could have been used to impeach the victim's testimony during the penalty phase of the trial.

■ We now turn to the legal analysis of Parks' petition challenging his murder conviction. The government contends that Parks' petition consists entirely of successive and abusive claims. Rule 9(b) of the Rules Governing Section 2254 Cases governs successive and abusive petitions and provides:

> A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

With regard to the successive claims, the burden is on the petitioner to show that "although the ground of the new application was determined against him on the merits on a prior application, the ends of justice would be served by a redetermination of the ground." *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *see also Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

■ With regard to the claims that Parks did not raise in his earlier petition, the state has the burden of pleading abuse of the writ. Once the state meets this

---

4. Parks has provided affidavits of individuals who support all of these contentions.

5. Parks has produced affidavits that support these contentions.

burden, the petitioner must show cause for his failure to raise the claim earlier and prejudice resulting from the default. *See McClesky v. Zant,* — U.S. —, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). In *McClesky,* the Supreme Court held that the cause and prejudice standard used in procedural default cases also "applies to determine if there has been an abuse of the writ through inexcusable neglect." *Id.* 111 S.Ct. at 1470. In his memorandum of law in support of a stay of execution filed with the district court, Parks concedes that he cannot show cause under *McClesky.* Therefore, Parks' claims that were not brought in his earlier petition are barred unless he "can show that a fundamental miscarriage of justice would result from a failure to entertain the claim." *Id.*

Because the Supreme Court equated the "ends of justice" inquiry with the "fundamental miscarriage of justice inquiry" in *McClesky,* 111 S.Ct. at 1471, we review both Parks' claims that are successive and those that abuse the writ under the same standard. The Supreme Court cautioned in *McClesky* that such relief should be granted in only "narrow cases" and that "[t]hese are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice." *Id.* at 1470. The *McClesky* Court explained that the ends of justice inquiry "require[s] federal courts to entertain successive petitions when a petitioner supplements a constitutional claim with a 'colorable claim of factual innocence.' The miscarriage of justice exception to cause 'serves as an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty.'" *Id.* at 1471 (quoting *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)). Thus, we must determine whether the constitutional violations in this case, if any occurred, probably caused the jury to convict an innocent man.

This inquiry involves three prongs: (1) a constitutional violation; (2) a probable effect on the jury's determination; and (3) the conviction of an innocent man. First, for the sake of this appeal only, we will assume—without deciding—that the alleged constitutional violations occurred. Second, we must decide on the appropriate definition of the term "probably." We recognize that the Supreme Court has recently granted certiorari to resolve this question with regard to the penalty phase of a trial. *See Sawyer v. Whitley,* 945 F.2d 812 (5th Cir.), *cert. granted,* — U.S. —, 112 S.Ct. 434, 116 L.Ed.2d 453 (1991). Because the Supreme Court will soon resolve this issue, we express no opinion as to the appropriate standard. However, for purposes of this appeal only, we will operate with the standard most favorable to the petitioner—the "fair probability" or "reasonable probability" standard instead of the "more likely than not" standard adopted by the Ninth and Eighth Circuits. *See Deutscher v. Whitley,* 946 F.2d 1443, 1444–46 (9th Cir. 1991); *Stokes v. Armontrout,* 893 F.2d 152, 156 (8th Cir.1989); *Smith v. Armontrout,* 888 F.2d 530, 545 (8th Cir.1989).

■■■ We emphasize that an integral part of this three-pronged inquiry is the claim or showing of innocence. The only limited license for the federal courts to reach back into the multitude of proceedings inherent in a death penalty case and, most especially, into the sacrosanct arena of the jury's guilt or innocence determination is where constitutional violations precluded the jury from having before it evidence or claims that probably would have kept it from finding the defendant innocent. Thus, where the defendant shows no cause for failing to raise these claims earlier, the defendant must show—at the threshold—both a constitutional violation and a colorable showing of factual innocence. Factual innocence must mean *at least* sufficient claims and facts that—had the jury considered them—probably would have convinced the jury that the defendant was *factually innocent.*[6]

---

6. Our analysis here should not be confused with the Fifth Circuit's decision in *Herrera v. Collins,* 954 F.2d 1029 (5th Cir.1992), *cert. granted,* — U.S. —, 112 S.Ct. 1074, 117 L.Ed.2d 279 (1992). Parks has alleged a constitutional violation that affected the evidence before the jury

■ This showing of factual innocence necessarily goes beyond the introduction of additional evidence or claims that merely suggest additional doubts that—had the claims or evidence been presented—might have loomed in the far-reaches of the jurors' minds as they individually contemplated the line that determines guilt beyond a reasonable doubt. The showing of factual innocence at this stage of a habeas proceeding must be more than an incremental, additional set of doubts. The federal court, in applying the "probably caused" prong of the standard, can only justify interference with the jury's verdict where the factual showing of innocence claim is directly related to the constitutional violation and is so strong that, had the excluded probative evidence been before it, the jury probably would have concluded that the defendant was innocent.[7]

■ After carefully scrutinizing all of the evidence that petitioner argues should have been presented to the jury and assuming that all of this evidence is credible, we simply cannot conclude that there is a fair or reasonable probability that the facts allegedly showing innocence would have caused the jury to find that Parks is innocent. The evidence proffered by Parks merely corroborates defense evidence that the jury rejected. Although these facts may bolster the defense, these claims do not amount to a threshold showing of factual innocence.

■ The fundamental miscarriage of justice standard also applies to the sentencing phase of the trial. *See Smith v. Murray*, 477 U.S. 527, 537–38, 106 S.Ct. 2661,

2667–68, 91 L.Ed.2d 434 (1986). Parks must demonstrate that there is a fair or reasonable probability that constitutional violations caused the jury to impose the death sentence when they otherwise would have declined to do so. After reviewing all of the evidence not admitted in the penalty phase, we conclude that there is not a fair or reasonable probability that the jury would have sentenced Parks any differently.

In his petition, Parks mainly asserts that he was denied valuable impeachment material when the government did not give him access to police reports concerning his robbery by force conviction. He argues that this information could have changed the jury's imposition of the death sentence. This contention ignores two facts. First, the police report indicates that one of Parks' co-assailants stated that Parks kicked the victim. Second, and most importantly, we stated in *Parks v. Brown*, 840 F.2d 1496, 1503 (10th Cir.1987), that

> [w]e refuse to believe that the jury would impose the death sentence because of Parks' conviction for a crime arising out of a school yard fist fight. To us, it is inconceivable that a jury of twelve adults would be influenced in any manner by such testimony to the end that such would affect their deliberation on either the question of guilt or penalty in a first-degree murder proceeding. We have more faith in the jury system.

Therefore, Parks' contentions in no way satisfy the fundamental miscarriage of justice standard.

and, therefore, the jury's deliberations. This places his claim squarely within the fundamental miscarriage of justice exception to the cause and prejudice standard. Parks can claim that "constitutional violations probably have caused the conviction of one innocent of the crime." Herrera cannot make this assertion. Rather, Herrera alleges that he has new evidence that demonstrates he is innocent. His alleged constitutional claim arises not from evidence that should have been presented to the jury, but from a claim that it violates either the Eighth or Fourteenth Amendment to execute someone who is innocent. Thus, he does not fall within the fundamental miscarriage of justice excep-

tion—that constitutional violations probably caused the conviction of one innocent of the crime.

7. We use an innocence standard because *McCle-sky* clearly mandates such a standard by focusing on the conviction of one innocent of the crime, *see* 111 S.Ct. at 1470, and because language in the body of *Kuhlmann* also indicates that an innocence standard is appropriate. 477 U.S. at 454, 106 S.Ct. at 2627. We note, however, that the *Kuhlmann* Court quoted extensively from an opinion by Judge Friendly, which suggests that a reasonable doubt standard is appropriate. *Id.* at 454 n. 17, 106 S.Ct. at 2627 n. 17.

Parks finally contends that a stay should be granted in order to allow him to exhaust his claim of actual innocence.[8] *See Herrera v. Collins*, 954 F.2d 1029 (5th Cir.1922), *cert. granted,* — U.S. —, 112 S.Ct. 1074, 117 L.Ed.2d 279 (1992). Parks states that if he "can show that he is probably innocent of his crime, and therefore has a claim under *Herrera,* he will also establish that a fundamental miscarriage of justice would occur if he were executed, thereby overcoming any procedural bar, including abuse of the writ." Parks' contention unequivocally equates the probably innocent standard with the fundamental miscarriage of justice standard. Thus, regardless of whether the Supreme Court decides to allow *Herrera* claims, Parks' stay cannot be granted. We already have determined that Parks cannot demonstrate a fundamental miscarriage of justice. Therefore, even if the *Herrera* claim were before this court, Parks does not present "substantial grounds upon which relief might be granted." *Barefoot v. Estelle*, 463 U.S. 880, 895, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090 (1983), and the stay must be denied.

Although we realize that the review of a death sentence is perhaps the most serious examination any court ever undertakes, we also must be cognizant that the Supreme Court has emphasized that " '[f]ederal courts should not continue to tolerate—even in capital cases—this type of abuse of the writ of habeas corpus.' " *McClesky,* 111 S.Ct. at 1471 (quoting *Woodward v. Hutchins*, 464 U.S. 377, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984) (per curiam)). Accordingly, we DISMISS Parks' petition for habeas corpus as successive and abusive and DENY his request for stay of execution.

---

**8.** Parks also asserts that a stay should be granted in order to allow his counsel more time to prepare. We disagree. The issues presented in this appeal have been presented in the state courts and have been rebriefed and reargued in the district court. Parks also has filed a brief with this court. We have reviewed all of these documents. Therefore, Parks has not suffered any prejudice due to the time constraints of this proceeding and is not entitled to a stay of execution on this ground. *See Barefoot v. Estelle,* 463

**HOLLOWAY, Circuit Judge, dissenting:**

**I**

I must respectfully dissent from the denial of a stay and the majority's rejection of this appeal. I would grant a temporary stay and give more deliberate consideration to this troubling appeal. My reasons follow:

The significance of the issuance here of the certificate of probable cause by the district judge should be considered in light of the standard laid down by the Supreme Court in *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). The Court there held that "a certificate of probable cause requires petitioner to make a 'substantial showing of the denial of [a] federal right.' " *Id.* at 893, 103 S.Ct. at 3394. The Court has explained that this standard means that "the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are 'adequate to deserve encouragement to proceed further.' " *Id.* at 893 n. 4, 103 S.Ct. at 3394 n. 4 (emphasis in original). The Tenth Circuit, of course, applies the same standard. *See Stevenson v. Thornburgh*, 943 F.2d 1214, 1216 (10th Cir.1991). Recently, the Supreme Court applied anew the *Barefoot* standard, which it quoted: "A certificate of probable cause requires petitioner to make a 'substantial showing of the denial of [a] federal right.' " *Lozada v. Deeds,* — U.S. —, 111 S.Ct. 860, 861, 112 L.Ed.2d 956 (1991) (per curiam). Thus, we must consider the impact of the district judge's issuance of the certificate in light of these controlling precedents. It is implicit that he recognized that the issues raised by Parks' habeas petition do make such a substantial showing.[1]

---

U.S. 880, 890, 103 S.Ct. 3383, 3393, 77 L.Ed.2d 1090 (1983).

**1.** The significance of the grant of the certificate of probable cause by the district judge is not diminished by the judge's denial of a stay of execution pending appeal. In his Order denying that stay, the judge did not address the merits of the motion for a stay pending appeal. Instead, he stated that: "As petitioner has filed his Notice of Appeal and his appeal is thus now pend-

This analysis leads directly to the standard for the issuance of a stay of execution in a second or successive habeas petition. *Barefoot* recognizes that such second or successive petitions present a different issue from first petitions in habeas. For a first petition, a stay of execution should be granted to prevent an appeal in a first habeas case from becoming moot. However, for second and successive federal habeas proceedings, "the granting of a stay should reflect the presence of substantial grounds upon which relief might be granted." *Barefoot*, 463 U.S. at 895, 103 S.Ct. at 3396. Recently, the Court has made clear that it still follows the *Barefoot* test as applicable for second or successive federal habeas petitions in death cases. *See Delo v. Stokes*, 495 U.S. 320, 110 S.Ct. 1880, 1881, 109 L.Ed.2d 325 (1990) (vacating a stay under the *Barefoot* test).

## II

In the instant habeas petition, Parks alleges that critical evidence concerning police interviews with David Bourn, a principal witness at the sentencing phase of Parks' trial, was not revealed. Although requested well before Parks' murder trial, these reports were not revealed by the state until the fall of 1991. Brief of Appellant at 56 (No. PC-92-79, Okla.Crim.App.); Brief of Appellant at 16 n. 13 (No. PC-92-78, Okla.Crim.App.). While the state complains about delay in presenting this new evidence, it overlooks the undisputed withholding of the reports until late 1991. The state does not deny that Parks requested this material in *1978*, eight months before Parks' trial, and that the evidence did not come to light until *1991*.[2]

In actuality, there were statements within the police department records which are reproduced as Appendixes NN and OO filed in this federal habeas case. These concern the earlier assault upon David Bourn at the high school which Bourn and Parks attended, and which could have been used at the sentencing phase for valuable impeachment of Bourn. Bourn was a key prosecution witness at the sentencing phase of Parks' trial. The first undisclosed report, dated February 2, 1972, by Officer Burrow reported a statement by David Bourn. Bourn said that a "NM had approached him and hit him as he was leaving one of the classroom areas and that another two or three male subjects had also jumped in and assisted NM in kicking him. He stated that he did not know if [ ] the other subjects were white or [ ] colored." Thus, Bourn's first statement did not identify Parks as his initial and principal assailant, contrary to Bourn's testimony at the penalty phase. Bourn was also unable to identify the number, race, or names of the other assailants in these 1972 statements to the police officers shortly after the altercation.[3]

The second report, Appendix OO to the federal habeas petition, is a report on the same incident by Officer Wolf. That re-

ing in the United States Court of Appeals for the Tenth Circuit, the application filed in this court is denied."

2. Attached to the Brief of Appellant in No. PC-92-79 (Okla.Crim.App.), is a "Motion to Produce Exculpatory Evidence," with a certificate of mailing to the District Attorney of Oklahoma County on January 23, 1978, eight months before Parks' trial in September 1978. The motion specifically requested "all information of whatever form, source or nature which tends to exculpate him [Parks] either through the indication of his innocence *or through the potential impeachment of any state witness* ... and all information ... *impeaching the credibility of any potential state witness* [.]" (emphasis added).

In a post-conviction proceeding in the District Court of Oklahoma County, Parks filed a pro se motion on August 11, 1987. That motion specifically asked the court to require disclosure of recordings and transcriptions of statements by ... *William David Bourn and W.S. Langwell* ... [and] any sworn or unsworn statements that the state has in its file regarding this particular case ... and all information ... *impeaching the credibility of any potential state's witness* [.]" (emphasis added).

3. The importance of the early statements to the police, all given within eight days after the assault on Bourn on 2/2/72, is shown by the time lapse from February 1972 until Parks' murder trial over six years later in September 1978 when Bourn gave very different testimony. Obviously, the early statements bear special importance.

port says that Assistant Principal W.L. Langwell stated:

> that he had some suspects in mind [ ] and had called DAVID BOURN into his office to make identification. He stated that the suspects that he had in mind were not identified by DAVID [bu]t that *DAVID saw the defendant GARY WAYNE RAY sitting in the office and immediately said [ ] that he was the assailant that had originally struck him in the face* on 2–2–72.
>
> [T]he victim [Bourn] gave the statement *that the suspect GARY RAY* started following him down the main hall at the north end of the school when they got outside and into ... the courtyard. *The suspect [Ray] walked up besided [sic] him and struck him in the right eye with his fists knocking him down* at this time two other suspects jumped on his back and one began kicking him.

Appendix OO at 2 (emphasis added).

The critical significance of the unrevealed police reports is that their nondisclosure kept important impeaching evidence out of the hands of Parks' attorneys at the penalty phase. At that point, the prosecutor used Bourn effectively to counter the only mitigating evidence introduced for Parks—his father's testimony that he "got along with everybody, had no problems.... in the neighborhood where we live ... there was always violence, fights and things like that; *and he [Parks] never did get in any fights or anything like that.*" Tr. 668 (emphasis added).

When Bourn testified in the sentencing phase, contrary to his statements to the police, he said that his initial assailant was Parks:

> Q. Who struck you in the side of the face?
>
> A. The *first time* it was ... had been *Robyn Parks.*
>
> Q. *Robyn Parks.* All right.

Tr. 687–88 (emphasis added).

The prosecutor denigrated the mitigating evidence from Parks' father with obvious support from this testimony by Bourn. After going over the father's statements that Parks was a happy-go-lucky youth, the prosecutor said: "But [Parks' father] also ... tried to give you the impression that [Parks] got along with everybody, and he had no problems, he didn't get in fights and never participated in any." Tr. 705–06. The prosecutor argued that the incident was not just a fight, stating that:

> you don't get that kind of charge [robbery by force] by a fight, so it was not a fight. It was three boys that just beat David Boren [sic] up to get his money. And what did he get? A lousy six cents. Can you imagine knocking a man to the ground, hitting him and stomping him, and kicking him, turning his pockets inside out for a lousy six cents?

Tr. 699.

The testimony of Bourn, which could not be impeached without the statements, and the arguments of the prosecutor are also significant because of their effect on the process of weighing the evidence of the aggravating circumstance found—that the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution." The evidence of Bourn and the argument, unanswered by the impeaching statements that Parks was *not* the initial and primary assailant, enhanced the jury's picture of Parks as a violent man and undoubtedly was damaging to Parks in weighing the aggravating circumstance and the mitigating evidence. With the help of the police reports, the defense could have minimized this damage considerably.

In connection with the facts outlined above, and the statements to the police that did not come to light until the fall of 1991, I note that in our earlier panel opinion in *Parks v. Brown*, 840 F.2d 1496 (10th Cir. 1987), the panel viewed the assault evidence as not significant in the penalty phase based on the record before the panel, noting the failure of the jury to find the aggravating circumstance of Parks being a continuing threat to society. However, there are two points that are now apparent that were not before the panel. First, the panel said "the jury was fully informed as to the circumstances giving rise to the robbery charge." *Id.* at 1503. We now know that the facts were not fully developed

because of the undisclosed police reports. Moreover, the added point we must focus on is the effect of Bourn's altered trial testimony on Parks' sole mitigating evidence—his father's testimony that he had not been involved in violence. These points present a very different picture than our panel had in 1987 or the sentencing jury had in 1978.

### III

Parks does not rely upon showing cause and prejudice for procedural default or abuse of the writ. Instead, he asserts that a "fundamental miscarriage of justice" will occur if his constitutional claims are not considered. This exception to the bars to federal habeas review has been mentioned by the Supreme Court in a series of cases. *See McCleskey v. Zant,* —— U.S. ——, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991); *Kuhlmann v. Wilson,* 477 U.S. 436, 454 n. 17, 106 S.Ct. 2616, 2627 n. 17, 91 L.Ed.2d 364 (1986); *Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649–50, 91 L.Ed.2d 397 (1986); *Smith v. Murray,* 477 U.S. 527, 537–39, 106 S.Ct. 2661, 2667–69, 91 L.Ed.2d 434 (1986); *Dugger v. Adams,* 489 U.S. 401, 412 n. 6, 109 S.Ct. 1211, 1218 n. 6, 103 L.Ed.2d 435 (1989).

Moreover, this fundamental miscarriage of justice exception has been translated over into the sentencing phase for death penalty cases. *See Smith v. Murray,* 477 U.S. at 537–38, 106 S.Ct. at 2667–68 (considering whether the petitioner was guilty of an aggravating circumstance). This court has likewise applied the fundamental miscarriage of justice analysis in the context

of the penalty phase of a death penalty case. *See Andrews v. Deland,* 943 F.2d 1162, 1186 (10th Cir.1991).

Here, Parks asserts three primary claims for habeas relief.[4] The district judge held the first claim constituted an abuse of the writ, and that the remaining two were successive claims previously asserted and denied in Parks' first federal habeas petition.

The ruling that presents a most serious question for us is the district court's decision concerning Parks' second claim—that the state improperly introduced false and misleading evidence, distorting Parks' role during the incident with Bourn, in the sentencing phase in violation of *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and that the prosecution suppressed the police reports and prevented the impeachment of Bourn's penalty-phase testimony pertaining to that incident in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court concluded that Parks' claim, which hinged solely on his assertion of factual innocence of the death penalty, did not present a "colorable showing" necessary for a finding of "actual innocence" under *Deutscher v. Whitley,* 946 F.2d 1443 (9th Cir.1991). The district judge denied this claim because he held that the jury had rejected "the state's arguments for the sole aggravating circumstance to which the robbery was relevant, when it refused to find that there was a probability that Parks would commit criminal acts in the future that would constitute a continuing threat to society."[5] Order at 13–14.

---

4. Parks' three claims are: (1) he was deprived of a fair trial because (a) his counsel was ineffective in failing to investigate various factual and other aspects of the guilt-innocence phase of his case, (b) the prosecutor created false impressions about the trial evidence, and (c) the prosecutor suppressed exculpatory evidence necessary to the trial; (2) prosecutorial misconduct denied him a fair sentencing determination; and (3) sentencing counsel was ineffective in failing to investigate facts relative to sentencing and in failing to present appropriate mitigating evidence.

5. In addition to the more important concerns expressed below, it should be noted that the

district court incorrectly dismissed Parks' penalty phase-related *Brady* and *Napue* claims as "successive." These claims were not presented in the first petition (not coming to light until 1991); therefore, they are not successive. Also, the district court dismissed Parks' second general claim without an evidentiary hearing on his allegations of prosecutorial misconduct regarding the nondisclosure of alleged *Brady* material without any comment at all. Unlike his dismissal of Parks' first general claim, the district court did not state that on the face of this record Parks could not show that the prosecution knowingly presented false evidence at Parks' sentencing phase trial.

This basis for rejecting the significance of the undisclosed evidence in the police reports is similar to the reasoning, discussed above, in our panel opinion in *Parks v. Brown*, 840 F.2d 1496, 1503 (1987). We now know, however, that the jury was not fully informed as to the circumstances giving rise to the robbery. Instead, we now know that there were statements recorded very shortly after the robbery incident in which Bourn did *not* identify Parks as his initial and principal assailant, but instead so identified Gary Ray. At the very least, the police reports would have given powerful impeaching evidence to Parks in the penalty phase to counter Bourn's testimony which challenged Parks' only mitigating evidence—that he was a nonviolent youth. It appears that the undisclosed evidence would thus make a substantial showing under the standard from *Deutscher* adopted by the district judge; the record now gives substantial support to Parks' claim "that constitutional error infected the sentencing process to such a degree that it is more probable than not that, but for constitutional error, the sentence of death would not have been imposed." *Deutscher*, 946 F.2d at 1446.[6]

Parks forcefully argues that "the prosecution presented materially inaccurate, false testimony ... in violation of the Eighth and Fourteenth Amendment[s.]" Memorandum of Law in Support of Motion for Stay of Execution at 29 (citing *Townsend v. Burke*, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). Under the precedents cited, if the prosecutor knowingly presented false evidence, the validity of Parks' sentencing becomes highly suspect. The grant of a certificate of probable cause was thus warranted and full consideration must be given to the constitutional claims.

In sum, the *Brady* and *Napue* claims, bottomed on the undisclosed police reports now revealed, raise issues which are, under the first prong of the *Barefoot* standard, "debatable among jurists of reason." Moreover, the *Brady* claim satisfies the second prong of the standard because the availability at trial of the reports for impeachment could have resulted in the jury's resolving sentencing "in a different manner." Thus, the district court correctly granted a certificate of probable cause.

I conclude that here, in light of the *Brady* and *Napue* claims, there are "substantial grounds upon which relief might be granted." *Delo v. Stokes*, 110 S.Ct. at 1881 (quoting *Barefoot*, 463 U.S. at 895, 103 S.Ct. at 3396). Unlike the circumstances in *Delo*, here the abuse of the writ does not apply because the recently disclosed evidence supports the *Brady* and *Napue* claims so that not considering those constitutional claims would result in a "fundamental miscarriage of justice." *Smith v. Murray*, 477 U.S. at 537–38, 106 S.Ct. at 2667–68.

As additional support for a stay, even if the application of the *Deutscher* standard is not ultimately adopted as proper in this circuit, the split in the courts of appeals over the appropriate standard to gauge whether a defendant is "actually innocent" of the death penalty indicates that a stay for further review should be granted. *See Sawyer v. Whitley*, 945 F.2d 812, 815 (5th Cir.), *cert. granted*, ⸺ U.S. ⸺, 112 S.Ct. 434, 116 L.Ed.2d 453 (1991). Additionally, Parks' substantial *Napue* claim demonstrates that a stay is necessary to determine whether an evidentiary hearing is required because Parks has never received a "full and fair evidentiary hearing" on this claim as required by *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963). *See Harris v. Vasquez*, 901 F.2d 724, 727 (9th Cir.) (opinion by Noonan, J.), *application to vacate stay*

---

6. In Oklahoma, the mitigating evidence concerning Parks' nonviolent nature was of critical importance in the penalty phase weighing process. The Oklahoma statutes provide that:

Unless at least one of the statutory aggravating circumstances enumerated in this act is so found or if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

Okla.Stat. tit. 21, § 701.11 (1991) (footnote omitted).

**1002**

*denied,* 494 U.S. 1064, 110 S.Ct. 1799, 108 L.Ed.2d 781 (1990) (granting stay for an evidentiary hearing in the district court).

I must dissent from the denial of a stay and the final disposition of this serious appeal without more deliberate consideration.