NERCO OIL & GAS, INC.

v.

M.R. FRIDAY, INC., et al.

Civ. A. No. 91–0460.

United States District Court,
W.D. Louisiana, Alexandria Division.

March 10, 1993.

James R. Sutterfield, R. Joshua Koch, Jr., Hoffman Sutterfield et al., New Orleans, LA, for plaintiff.

William O. Bonin, Alfred Smith Landry, Landry, Watkins & Bonin, Nan M. Landry, New Iberia, LA, for defendants.

## RULING

LITTLE, District Judge.

Nerco's suit is grounded on Friday's breach of an indemnity agreement. That breach impacted Friday's insurers, also de-

---

fendants in this matter. The defendants have filed an answer asserting defenses, including the frequently litigated Louisiana Oilfield Anti–Indemnity Act (La.R.S. 9:2780). The defendants have also filed a motion for summary judgment essentially asserting that the Anti–Indemnity Act (the Act) is a complete shield to Nerco's demands, so much so that a complete dismissal is warranted. Nerco has filed a motion to strike the Act defense of the defendants.

As we will demonstrate by the following discussion, the motion for a summary judgment is GRANTED. Concomitantly, the motion to strike is DENIED.

The uncontested material facts follow. For many years, fugacious minerals have been the subject of exploration and capture in the Black Lake Field in Natchitoches Parish, Louisiana. Historically, the Black Lake Field has been, and continues to be, a minerally productive area. Within the Black Lake Field are production units approved by the Louisiana Commission of Conservation. It is fair to say that the units are created for the purpose of conserving minerals so that natural resource waste will not result from unregulated drilling and production. The unit in the Black Lake Field that stages this lawsuit is described in Commissioner's Order No. 686 dated 27 January 1965.

Nerco is the authorized unit operator. Generally speaking, the operator is charged with the responsibility of a prudent manager. The operator manages the property in such a manner that the maximum benefits are obtained for the mineral owners, having due regard for the regulatory laws. The operator also oversees the maintenance and replacement of equipment and machinery. It is not unusual for the unit operator to elicit the assistance of independent contractors to perform some of the duties contractually undertaken by the unit operator.

In this instance, Nerco, the unit operator, contracted with M.R. Friday, Inc. to perform maintenance tasks. We need not reiterate all the terms of the 5 February 1988 contract between Nerco and Friday. We do, however, point out three provisions in the agreement. First, the scope of the work undertaken by and assigned to Friday is stated in non-technical terms.

1.1 CONTRACTOR shall furnish qualified supervision, labor and craftsmen which are necessary to perform any and/or all work of maintenance, repair, and renovation, including turnarounds, and minor capital expansions assigned to CONTRACTOR by OWNER's GOLDONNA, LOUISIANA, BLACK LAKE UNIT FACILITIES. It is to be understood that CONTRACTOR does not have exclusive rights to all work to be assigned by OWNER as further defined in Article 11.1.

Defendants' Exhibit C at 1, Maintenance Agreement. Second, paragraph 9 places upon Friday the obligation to defend, indemnify, and hold harmless Nerco for liability and expenses it may face from suits brought by any person including Friday employees. The responsibility of indemnity is limited, however, to "the maximum extent allowed by law." Paragraph 9, Maintenance Agreement.

Finally, Friday is required by paragraph 22 to provide insurance to cover its responsibilities undertaken in the contract.

On 19 April 1989, Friday was working at Nerco's instruction in the Black Lake Field on a facility known as the Satellite # 3 Compressor Station. An explosion occurred resulting in injury and property damage. Nerco's responsibility has been determined vis-a-vis the injured parties. In accordance with the contract terms, Nerco seeks indemnity from Friday and its insurers for the payments Nerco made as a result of the explosion. Friday and its insurers resist the demand reasoning that the indemnity is prohibited by the Act.

Friday's summary judgment motion and Nerco's motion to strike the Friday defense center on the same subject viz the application of the Act to the promise of indemnity. If the Act applies, Friday owes no indemnity. If the Act is inapplicable, the promise is enforceable.

■ Summary judgment will be granted only if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). In our analysis, "[w]e must 'review the facts drawing all inferences most favorable to the party opposing the motion.'" *Valley Construction Company v. Marsh,* 984 F.2d 133, 134 (5th Cir.1993) (*quoting Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir. 1986)). Before we can find that there is no genuine issue for trial, the court must be satisfied that the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

■ We need not revisit the parsing of the Act conducted by the Fifth Circuit in *Transcontinental Gas v. Transportation Insurance Co.,* 953 F.2d 985 (5th Cir.1992). Nor need we cite every case interpreting the Act, although we will cite some that do. We will, and do, mention that the judicial effort employed in analysis of the Act leads one to consider that the Act is less than pellucid and could stand legislative fine tuning. The Louisiana Supreme Court has described the purpose of the Act.

> The purpose of the legislature, and thus the policy interest of the state, is to protect certain contractors, namely those in the oilfields, from being forced through indemnity provisions to bear the risk of their principals' negligence.

*Rodrigue v. Legros,* 563 So.2d 248, 254 (La. 1990).

Synthesizing the system suggested for the Act's applicability by the Fifth Circuit in *Transcontinental Gas, supra,* we look first to the agreement. We must discern if the agreement pertains to an oil, gas, or water well. The agreement in this instance is described by the parties (Nerco and Friday) in the amendment to the agreement as one by which Friday "furnishes supervision, labor, and craftsmen necessary to perform certain work, maintenance, repairs, and renovations on Owner's (Nerco's) unit facilities, Black Lake Field, Natchitoches Parish, Louisiana." It is uncontested that (1) Nerco is the unit operator of Black Lake Field in Natchitoches

Parish, Louisiana; (2) the unit was created by the Louisiana Commission of Conservation in January of 1965; (3) Nerco has the authority to conduct unit operations; (4) unit operations include the capture of desirable and undesirable subsurface substances; (5) Nerco contracted with Friday, the latter agreeing to do as directed by Nerco at the Black Lake Unit Facility. It is our opinion that the Nerco–Friday agreement does pertain to services to be performed by Friday in the oilfield operated by Nerco. A specific well is not mentioned, but it is clear that all wells, under Nerco's control in the unit are subject to maintenance and construction by Friday at Nerco's order.

We stop to describe the uncontested configuration of the mineral field in question. There are a number of producing wells in the field. This many headed hydra has tentacles extending from each head to, in this instance, Compressor Satellite #3. In each tentacle and under pressure (to be described later) the subterranean substance flows to Satellite #3. Thus, the one satellite services the production from a number of wells. Collectively, the unit wells in this description can be referred to as one well, as contemplated by footnote 40 in the *Transcontinental Gas* opinion, *supra,* at 995.

We next inquire as to the relationship between the activities undertaken by Friday as per the agreement and the exploration, development, production, or transportation of oil, gas, or water from the well(s). We must determine what Friday did at Nerco's direction, as required by the agreement. Before discussing the specific activities in the context of operation of the field, we feel constrained to disclose the central message of the *Transcontinental Gas* analysis. The Act applies to drilling for and production of minerals from a well. If the questioned activity is not involved in what one may describe as the first level activity, the Act is inapplicable. For example, an entity that contracts with an owner to provide food service to well workers at the offshore well site during exploration and extraction is covered by the Act. *Broussard v. Conoco, Inc.,* 959 F.2d 42 (5th Cir.1992). *See also, Copous v. ODECO Oil & Gas,* 835 F.2d 115 (5th Cir.

432

1988). A company engaged to construct an intermediate segment of an interstate gas transmission pipeline that was not related to exploration or production or transportation of minerals from a particular well will not be covered by the Act. *Hanks v. Transcontinental Gas Pipe Line Corp.*, 953 F.2d 996, 999 (5th Cir.1992).

With those observations in mind, we ask what the uncontroverted facts reveal about the Friday activity at the time of the accident. Mr. Friday, the principal owner of M.R. Friday, Inc., describes the accident event in his affidavit:

I am familiar with Satellite # 3, which forms a portion of that production facility.

On or about April 19, 1989, an accident occurred at Satellite # 3 in which I and several of my employees received injuries. At that time and place, Satellite # 3 received products directly from certain wellheads, and was the first facility to which water, oil, gas, and other fluids went from the wellheads. There were several flow lines going to Satellite # 3 from the wells.

One of the several uses for the compressors at Satellite # 3 was to reduce pressure and consequently keep some of the wells flowing because the wellhead pressure in some of those wells had diminished.

At the time of the accident, Satellite # 3, including separators, compressors, and tanks, was in operation. Some of my workers were connecting a fiberglass tank, currently being used as a sump, and ultimately, to be used for containment of salt water removed from the oil and gas. We were also working on a piping setup for the compressors, but the compressors were presently being used on a temporary line in the production process.

Defendants' Exhibit 8 at 1, Affidavit of M.R. Friday. We have reviewed the depositions of Mr. Melbourn Printis McLeod, the man in charge of production for Nerco. He described the work done in the field as part of the production operation; the operation at Satellite # 3 as being part of the production process, specifically a gathering point for gas and oil from the wells. The Satellite will increase the pressure on the gas and oil to bring it to the plant. Nerco admitted, in its response to Friday's requests for admissions, that the particular work being performed by M.R. Friday, Inc. at the time of the accident was the tying in of the disposal system in connection with the construction of Satellite # 3; that Satellite # 3 at Black Lake was designed, among other functions, to separate natural gas and liquid hydrocarbons from each other and from waste products (mainly salt water); that the actual task being performed at that time was connection of piping between the east and west waste storage tanks and the fabrication and installation of piping valves and regulators to both tanks; and that the work being performed related to final construction of a system to dispose of water and other waste after processing and compressing of commingled gas. Friday was working, as per the agreement with Nerco, on a system that was a part of the production process for definite wells in a definite field. We can reach no other conclusion. After giving due regard to those factors that are relevant to this case, as described in *Transcontinental Gas, supra* at 994–95, we are convinced that the products emanating from below the earth through the field wells can be identified, and it is precisely those products that were measured and treated by the equipment upon which Friday was working at the time of the accident.

The Act applies; the indemnity is flaccid. An appropriate judgment will issue.